IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

09-21504

TELMO HURTADO HURTADO

vs.

Eric Holder, United States Attorney
General, and Hilary Clinton, United
States Secretary of State,

_____/

MAGISTRATE
BANDSTRA

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. §2241

Petitioner, TELMO HURTADO-HURTADO, through undersigned counsel

and pursuant to 28 U.S.C. § 2241, respectfully files the following petition for a

writ of habeas corpus challenging his confinement pursuant to the "Order Re:

Request for Certificate of Extraditability" filed by United States Magistrate Judge

O'Sullivan on May 13, 2009, in case number 08-22414-CIV-O'SULLIVAN.[1]  Mr.

Hurtado-Hurtado is presently incarcerated.

---

[1]

On May 5, 2009, Magistrate Judge O'Sullivan held a hearing on the request for extradition
and heard argument from counsel.  Undersigned counsel has attached a copy of the transcript
of the hearing and will refer to it throughout this Petition as "T" (Exhibit F)

1

## JURISDICTION

The statutory scheme governing extradition proceedings does not provide for appellate review of an order of extradition issued by a United States Magistrate Judge. *See* 18 U.S.C. § 3184, *et seq.* However, courts have noted that a challenge to an extradition order may be made through a petition for a writ of habeas corpus. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Hill v. United States*, 737 F.2d 950, 951 (11th Cir. 1984); *Bobadilla v. Reno*, 826 F. Supp. 1428, 1431 (S.D. Fla. 1993).

## STATEMENT OF ISSUES

I.      The Magistrate Judge lacked the authority to certify Hurtado as extraditable where the principle of *non bis in idem* barred extradition to Peru after having previously been tried and acquitted for the same offenses.

II.     The Magistrate Judge lacked the authority to certify Mr. Hurtado as extraditable where the extradition request was barred for violation of Article 14(7) of the International Covenant of Civil and Political Rights.

III.    The Magistrate Judge lacked the authority to certify Mr. Hurtado as extraditable on the offense of seven murders allegedly perpetrated on September 13, 1985 because the complaint does not support a finding of probable cause.

IV.     The Magistrate Judge lacked the authority to certify Mr. Hurtado as extraditable where the government failed to satisfy the dual criminality requirement for extradition

2

in that the facts presented in the request fail to describe a criminal act both in Peru and in the United States.

V.    The Magistrate Judge improperly certified extraditability where fundamental fairness dictates that Mr. Hurtado not be returned to a country where he has already been tried and acquitted of charges.

## BACKGROUND

On August 29, 2008, the United States, acting on behalf of the Government of Peru, filed a complaint seeking extradition pursuant to the Extradition Treaty between the United States and Peru. The acts for which Mr. Hurtado is being sought stem from the killing of 69 villagers in the Accomarca region of Peru and for the forced disappearance of a guide on August 14, 1985. After an investigation was conducted and it was determined that criminal charges were to be filed, the military and civilian court argued over who had jurisdiction. On March 11, 1986, the Supreme Court of Peru decided that jurisdiction fell to the military court. (Exhibit A). Mr. Hurtado was eventually tried and acquitted of all murder charges, but found guilty of abuse of authority. The charges for which Mr. Hurtado were acquitted include all murders from the incidents on August 14 and September 13, 1985. He was sentenced to 6 years prison. On May 8, 1995, Mr. Hurtado completed serving his entire sentence. (Exhibit B). On June 15, 1995, one month after completing Hurtado's sentence, the President of Peru granted amnesty to anyone who may have violated human rights violations while combating the Shining Path guerrillas. On January 11, 2002, the Supreme Court of Military Issues made null and void the judgment of the Supreme Court granting amnesty to Mr. Hurtado.

On March 16, 2009, Mr. Hurtado filed a Motion to Dismiss Complaint and/or Quash Warrant Requesting Extradition. The basis for the motion was that the principle

3

of *non bis in idem* and the International Covenant of Civil and Political Rights, Article 14, Section 7, barred Peru's ability to seek extradition of Mr. Hurtado where he had previously been tried and acquitted of the same charges. (D.E. 29). The Court denied Mr. Hurtado's Motion, without a hearing, on April 16, 2009. (D.E. 32).

On May 5, 2009, the Court conducted an extradition hearing pursuant to 18 U.S.C. §3184. Magistrate Judge O'Sullivan issued an order certifying extradition and commitment on May 13, 2009. (D.E. 37).

## ARGUMENT

The evidence set forth by the government in the Complaint with a View Towards Extradition ("complaint") does not support the extradition of Mr. Hurtado. More importantly, the complaint should be barred based upon constitutional violations of double jeopardy or *non bis in idem. See In the Matter of Extradition of Burt*, 737 F.2d 1477 (7th Cir. 1984) (Federal Courts undertaking habeas corpus review of extradition have the authority to consider defects in extradition procedures and substantive conduct of the United States if its conduct violates constitutional rights).

I.  THE PRINCIPLE OF *NON BIS IN IDEM* BARS EXTRADITION OF TELMO HURTADO-HURTADO TO A COUNTRY IN WHICH HE HAS PREVIOUSLY BEEN TRIED AND ACQUITTED FOR THE SAME OFFENSES

The international concept of *non bis in idem,* or double jeopardy as commonly referred in the United States, holds that no one shall be twice placed in jeopardy for the same offense. This principle is well established throughout the world in various legal

4

systems.   However, its application in Extradition proceedings has been difficult to ascertain due to the differences in legal systems. M. Bassiouni, *International Extradition: United States Law and Practice* 693 (4th ed. 2002).

There are three factual situations where double jeopardy may apply to an extradition matter: where an individual had been prosecuted and convicted or acquitted by 1) the requested state 2) the requesting state or 3) a third state. *International Extradition* at 696.

Article IV of the Treaty between the United States and Peru sets forth the bases for denial of extradition. Accordingly, extradition shall not be granted:

> (a) if the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.  However, extradition shall not be precluded by the fact that the authorities in the Requested State have decided not to prosecute the person sought for the same acts for which extradition is requested, or to discontinue any criminal proceedings that have been instituted against the person sought for those acts.

There is no doubt that the Treaty, through its written words, specifically bars extradition where an individual was already prosecuted in the requested state (United States).  Unlike some treaties, the treaty between the United States and Peru specifically contemplates the principle of double jeopardy.  In order to determine the scope of the double jeopardy provision within any treaty, it is necessary to look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-432 (1943).  In describing paragraph (1)(a) of Article IV, the Senate Report notes in a footnote that,

"nothing in this provision enables the Requested State to bar extradition on the ground that the person sought has been convicted or acquitted in a third State." S.Exec.Rep.No. 107-12, 107th Cong., 2nd Sess. fn7 (2002) (Exhibit C).    The legislative intent demonstrates that extradition cannot be denied where an individual was tried in a third state.   The third type of situation, the one where the defendant, Telmo Hurtado-Hurtado falls, is not addressed.   However, the mere fact that this was not addressed in the legislative intent does not mean that congress precluded it as a defense.   One reason why it may not have been mentioned in the treaty or the senate report is that there have been no cases where extradition was sought by a country that had already tried an individual for the same offense.   On the other hand, there are numerous examples in extraditions treaties where double jeopardy clauses prohibiting extradition or prosecution of persons already prosecuted and convicted or acquitted by the requested country.   *Galanis v. Pallanck*, 568 F.2d 234, 238-39 (2nd Cir. 1977); *see also Sindona v. Grant*, 619 F.2d 167, 177 (2nd Cir. 1980) (citing various extradition treaties containing such double jeopardy clauses).   Federal courts have recognized that double jeopardy provisions in treaties may contain provisions barring more prosecutions than may otherwise be barred under current interpretations of the Constitution's double jeopardy clause. *See Sindona*, 619 F.2d at 178 (double jeopardy provision in extradition treaty between United States and Italy broader than the Constitution's double jeopardy clause);   *United States v. Jurado-Rodriguez*, 907 F.Supp. 568 (E.D. New York 1995) (charge dismissed under broad scope of *non bis in idem* where United States sought to prosecute defendant for crime which he had already been convicted in Luxembourg).

6

The question presented in the instant case, is whether double jeopardy or *non bis in idem* is a defense to extradition specifically where the individual was previously tried in the requesting state. According to Bassouni, an authority often cited by Courts in extradition matters, the requested state should not surrender an individual where he was previously prosecuted and acquitted, or prosecuted and convicted and served his sentence, if he is sought for the same offense by the same state which convicted or acquitted him. *International Extradition* at 696. The rationale for barring extradition is not just one of fundamental fairness, "but also that the requested state is not likely to lend its processes to give the requesting state another opportunity to prosecute the same person for the same offense of which he was found innocent."*Id.* One could argue that the facts surrounding the crimes charged in the criminal complaint filed in Peru are especially gruesome and egregious. Further, there has been an outcry from human rights organizations seeking justice against Mr. Telmo Hurtado-Hurtado. However, there is no question that he was previously charged, tried and acquitted for the exact offenses which Peru is seeking to extradite. Peru cannot circumvent the law because they are dissatisfied with the result obtained in the first trial against Mr. Hurtado-Hurtado. Concurrently, the United States should not aid Peru in their quest to right a wrong which they believe was originally made in Mr. Hurtado's case.

II.     ARTICLE 14(7) OF THE INTERNATIONAL COVENANT OF CIVIL AND POLITICAL RIGHTS BARS EXTRADITION OF TELMO HURTADO-HURTADO BASED UPON DOUBLE JEOPARDY

To promote uniformity throughout the world, the International Covenant of Civil and Political Rights (ICCPR) was ratified on June 8, 1992. As a properly ratified treaty,

7

the ICCPR is a part of the supreme law of the land. Article 14(7) of the ICCPR provides that "[n]o one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country." (Exhibit D). This provision embodies the international concept of double jeopardy or, *non bis in idem*, which comes from the Roman law maxim, "*Nemo debet bis vexari pro eadem causea*." (No one should be twice harassed for the same cause.) The principle derives from a sense of fairness, and can be analogized to the civil law concept of res judicata. The concept goes back to ancient times and is found throughout the civil as well as the common law. *See Bartkus v. Illinois*, 359 U.S. 121, 151-55 (1959) (Black, J., dissenting) (outlining the history of the double jeopardy concept.) The principle is common to legal systems generally and in many countries is constitutionally mandated. It has achieved international recognition by its inclusion in many widely ratified human rights instruments, of which the ICCPR is one.

Article 14(7) of the ICCPR, to which both the United States and Peru are signatories, and which is part of the Supreme Law of the Land, clearly prohibits a second prosecution of Mr. Hurtado for the same acts for which he has already been duly tried, convicted of lesser charges and sentenced. The United States has entered into a treaty obligation which it must honor.

The government argues that the ICCPR is not applicable since the treaty was non-self executing. The Senate, when ratifying the treaty, stated that provisions 1 through 27 of the Covenant were not self-executing. 138 Cong. Rec. S4781-84 (April 2, 1992). The Bush Administration explained that the "not self-executing" declaration meant, "the intent is to clarify that the Covenant will not create a private cause of action in U.S.

8

Courts." *Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights*, 31 I.L.M. 645, 657 (1992).  There is no doubt that Courts have interpreted that a private cause of action will not prevail based upon a non self-executing Treaty.  *See Medellin v. Texas*, 128 S.Ct. 1346  (2008) (the international law obligation cited by Petitioner, based on not self-executing Treaties, did not require local law enforcement officers to inform individuals of the right to notify the consulate of their detention.); *Igartua De La Rosa v. United States*, 32 F.3d 8 (1st Cir. 1995) (the ICCPR did not create legal obligations as to require that U.S. citizens residing in Puerto Rico be allowed to vote in presidential elections); *Ralk v. Lincoln County, Georgia*, 81 F.Supp.2d 1372 (S.D. Georgia 2000) (ICCPR precluded action brought by pretrial detainee alleging human rights violations based upon improper medical treatment).   However, the distinction in the current case is that Telmo Hurtado-Hurtado is relying on Article 14(7) of the ICCPR as a valid defense to the government's complaint in favor of extradition. *See* David Sloss, *The Domestication of International Human Rights: Non-Self-Executing Declarations And Human Rights Treaties*, 24 Yale J.Int'l L. 129, 152, 220 (1999) ("courts should reach the merits of treaty-based human rights claims when individuals raise those claims as defenses to civil or criminal charges filed by the government."); Carlos Manuel Vazquez, *Treaty-Based Rights and Remedies of Individuals*, 92 Colum.L.Rev. 1082, 1143 (1992).

Although this is a case of first impression in the United States, the holding in *United States v. Duarte-Acero*, 208 F.3d 1282 (11th Cir. 2000), can guide the Court in its decision.  In *Duarte-Acero*, the defendant was charged in an Indictment with conspiracy

9

to murder two special agents of the Drug Enforcement Administration.   Duarte-Acero had already been tried and convicted in Colombia for the same offenses which were the subject of the Indictment in the United States.   Duarte-Acero filed a Motion to Dismiss premised on two theories.   The first was that *non bis in idem* or double jeopardy barred his extradition.[2]   The second theory was that the International Covenant of Civil and Political Rights barred his prosecution for the exact same offenses for which he had already been tried in Colombia.   The Eleventh Circuit disagreed reasoning that the ICCPR was inapplicable because the defendant was arguing that he couldn't be tried in the United States where he had previously been tried for the same offense in Colombia. The Court reached this determination by looking at the intent behind Congress' ratification of the treaty in 1992.   According to the legislative history, the double jeopardy clause in section 7 of Article 14 applies only when the judgement of acquittal has been rendered by a court of the same governmental unit, whether the Federal Government or a constituent unit. 138 Cong. Rec. S4783-84 (daily ed. Apr. 2, 1992) (Exhibit E). "Thus, a successive prosecution is barred only when the accused is tried under the same law and criminal procedure.   Intuitively, this would only happen when the second prosecution takes place in the same country." *Acero-Duarte*, 208 F.3d at 1286. The facts in the instant case are directly applicable to the holding in *Acero-Duarte* since Peru is seeking extradition of Telmo-Hurtado Hurtado for an offense in which he was previously tried and acquitted in the same country.

---

[2]

This argument was quickly struck down by the Court because there was no treaty in place between the two countries.

III.   The Magistrate Judge lacked the authority to certify Mr. Hurtado as extraditable on the offense of seven murders allegedly perpetrated on September 13, 1985 because the complaint does not support a finding of probable cause.

The government's evidence at the hearing suggests that on September 13, 1985, Hurtado and others went back to the area to eliminate any additional witnesses that may have been present. (Gov't Exhibit 3 at 81-83; T:10/19-22). The defense submits that the government lacked sufficient evidence where the only evidence presented was a Summary Report to support probable cause. In *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1165 (11th Cir. 2005) (*citing Collins v. Loisel*, 259 U.S. 309, 217 (1922)), the Court held that unsworn statements of absent witnesses may be considered by the Court in determining probable cause during an extradition hearing. However, the present case lacked any statements, sworn or unsworn. While the evidence suggests that a witness named Floriano De La Cruz was present, there was no accompanying statement by Mr. De La Cruz. Unlike the other evidence in the case, where there were witness statements and declarations by Mr. Hurtado, there were no such corroborating evidence as to these seven murders. A simple statement in a summary report is insufficient to satisfy the probable cause element to an extradition request.

IV.   The Magistrate Judge lacked the authority to certify Mr. Hurtado as extraditable where the government failed to satisfy the dual criminality requirement for extradition in that the facts presented in the request fail to describe a criminal act both in Peru and in the United States.

11

The principle of dual criminality states that a fugitive may only be extradited if the acts constituting the offense are criminal in both the jurisdiction in which the fugitive is found and the jurisdiction to which the fugitive's extradition is sought. *See Caplan v. Vokes*, 649 F.2d 1336, 1343 (9th Cir. 1981). The defense argues that Mr. Hurtado was acting in the line of duty when these crimes were allegedly committed. There is no doubt that the facts support the fact that he was ordered to the Accomarca region of Peru to seek out terrorist members of the Shining Path during a time of war. These killings occurred while on duty. There is no comparable state or federal crime that is comparable to murder while in the line of duty. Therefore, the dual criminality element was not satisfied.

V.     The Magistrate Judge improperly certified extraditability where fundamental fairness dictates that Mr. Hurtado not be returned to a country where he has already been tried and acquitted of charges.

Basic notions of fairness dictate that Mr. Hurtado not be re-prosecuted for a twenty-three year old crime for which he has already paid his debt to society. There is a theory that was born of the case *Gallina v. Fraser*, 278 F.2d 77, 79 (2nd Cir. 1960), which states that there can be situations where the realtor upon extradition would be subject to procedures or punishment so anti-pathetic to a Federal Court's sense of decency as to require a re-examination of the principles set forth in extradition law. Magistrate Judge Garber in *United States v. Fernandez-Morris*, 99 F.Supp.2d 1358 (S.D.Fla. 1999), discussed the *Gallina* dictum stating that while it has been cited favorably by numerous courts, it has

never been applied. *Id.* at 1371. While his decision to deny extradition was based on a lack of probable cause, there was no question that the process afforded the defendant's in that case shocked the conscience of the Court. *Id.* at 1372.

In the instant case, the fact that Mr. Hurtado has previously been tried and acquitted of these charges and served a sentence on a lesser offense should shock the conscience of the court. While it may be argued that the charges facing Mr. Hurtado are particularly egregious, this country has always stood proudly by its constitution and the rights afforded to individuals. Courts, while they may be loathe to dismiss a case with egregious facts, will nonetheless do so when faced with a constitutional violation. Peru is attempting to use the United States, as a conduit, to exact their particular brand of justice because they are dissatisfied with the results. It is particularly interesting in light of the fact that the Supreme Court of Peru initially decided that jurisdiction fell to the military courts. After displeasure with the military court's results by human rights organizations and others, the Supreme Court changed their decision to allow Mr. Hurtado to be tried in a civilian court. This is exactly the type of situation in which the *Gallina* court contemplated. Thus, extradition should be denied.

## CONCLUSION

Based on the foregoing, Mr. Hurtado respectfully submits that this Court should grant his petition for a writ of habeas corpus, vacate the Magistrate Judge's certificate of extraditability, and order Mr. Hurtado's immediate release.

Respectfully submitted,

KATHLEEN WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____

Sabrina Puglisi
Assistant Federal Public Defender
Florida Bar No. 0324360
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Fax: (305) 536-4559

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing was mailed on this 4th day of May, 2009 to: William White, Assistant United States Attorney, 99 N.E. 4th Street, Miami, FL 33132.

By: _____

Sabrina Puglisi

14

# EXHIBIT "A"

---
### TRANSLATION FROM SPANISH INTO ENGLISH
---

...March 11, 1986

**WHEREAS:** the record shows that the events that prompted the investigation from which this incident was derived took place in Accamarca, an area within the emergency zone, and the accused are members of the Army, the provisions of Article 10, Law 24,150, apply; with regards to the RESOLUTION OF THE MATTER OF JURISDICTION, it was DECLARED that the jurisdiction over the investigation/indictment against Telmo Hurtado Hurtado and others for the crimes of simple homicide and aggravated homicide in detriment of Juliana Baldeon Garcia and others rests with the Permanent War Board [Consejo de Guerra Permanente] for the Second Judicial Zone of the Army - Lima, to whom all the proceedings will be transferred. Notice was given to the Ad-hoc Court [of Initial Proceedings/Magistrate Court], and they returned it.

*There are various signatures affixed to the document, but hey are not identified.*

*Also affixed to the document there is the impression of an inking stamp. The stamp reads, NOTICE GIVEN and then below it also reads EUSEBIO MONTALVO RAFAEL, Administrative Secretary of the Supreme Court. A signature appears entered right above the name therein.*

**WHEREAS:** the criminal act subject of this jurisdictional dispute, that constitutes the crime of multiple aggravated homicide is not included as ...

*A partial and illegible impression of an inking seal can be seen on the upper left corner of the document.*

C:\Documents and Settings\Alfonso\\HFLS\Local Settings\Temporary\60\0C8-HURTADO HURTADO, TELMO - 2009-01-14 - Judgment (fragment) - (SIHAI) wg 1

---
Office of the Federal Public Defender for the Southern District of Florida • Translation & Interpretation Unit
---



//En, once de Marzo de ............................................

mil novecientos ochentaséis.-.............................................

.......................Vistos;y CONSIDERANDO:que aparece

de autos que los hechos que motivan las instrucciones de la que

deriva esta incidencia se perpetraron en Pucamarca,localidad com

prendida dentro de la zona de emergencia y siendo los inculpados

miembros del Ejército,es del caso dar aplicación a lo dispuesto

en el artículo décima de la ley veinticuatro mil cien to cincuen

ta:DIRIMIENDO la contienda de competencia:DECLARARON que el co

nocimiento de la instrucción seguida contra Telmo Hurtado Hurta

do y otros por los delitos de homicidio simple y homicidio cali

ficado en agravio de Juliana Baldeón García y otros,corresponde

al Consejo de Guerra Permanente de la Segunda Zona Judicial del

Ejército -Lima- , el que se remitirá todo lo actuado,con aviso

al Juzgado de Instrucción Ad-hoc de Huamanga;y los devolvieron.-

a del Pino

a Cadamanwe

orio Rodríguez

a Rosas

a Valdivia

SE PUBLICO CONFORME A LEY

EUSEBIO MONTALVO RAFAEL
Secretario en lo Administrativo
de la Corte Suprema

CONSIDERANDO:que el hecho ilícito

penal materia de esta contienda de competencia,que configura el

delito de homicidio calificado múltiple,no está comprendido com

.......//..



que antecede de...
de copia ...das ...,
al que me remito an...
necesario previa contin...
tación de Ley.

Lima 10 JUL 2006

MARÍA CECILIA SOTO...

# EXHIBIT "B"

## CERTIFICATE OF NOTIFICATION

In Lima, at 15:30 hours on June 30, 1993. Infantry Captain Telmo Ricardo HURTADO HURTADO appeared before this First Permanent Military Court, included in this Case for the crime of Abuse of Authority with the aggravating crime of Falsehood, for purposes of being notified as to the content of Radiogram number 18-R-CSJM (Supreme Council of Military Justice) of this date, through which the Supreme Counsel of Military Justice grants him the benefit of PAROLE; through the reading to him of said Radiogram; as a result this Military Court orders his immediate release, expediting the respective official note to the PROVOST of the Army Instruction and Military Doctrine Command (COINDE), to the knowledge of Military Police Battalion number 503 from CHORRILLOS, the COINDE Command, the Military Personnel Command, the Supreme Council of Military Justice and the Permanent War Council for the Second Judicial Zone of the Army; likewise ordering the obligation of the convict to report at the end of each month at the respective Registration office of this Judicial Office, until the completion of his sentence that will end on May 8, 1995, to timely notify as to changes in his location or absences from the Unit; stating that the convict is presently working at the Infantry School belonging to the Army Instruction and Military Doctrine Command, and that he is in agreement with the parole that has been granted; with which the proceedings concluded and it was read to the convict, who signed it, and then it was signed by the Military Judge, in my presence and I am a witness thereof.-------------------------------------------

/s/
0-203147147-0
JAIME E. GALAN ROJAS
Maj. SJE
Permanent Military J.

/s/ Telmo Hurtado
0-219742861-B
TELMO HURTADO HURTADO
INF. Captain

/s/
-117768000-
HUGO ROMERO DELGADO
Captain. SJE
Secretary Attorney

*Note: On the back of this document there appears a certificate of authentication of this photostatic copy dated in Lima on the 27th of October, 2006 and signed by CAPTAIN Hector M. Estrada Munoz, Counsel of the JMPL - 2nd. ZJE. Also there appears a partially legible inking seal from the Fourth Military Court, Judicial Military Zone.*



ACTA  DE  NOTIFICACION

En Lima, siendo las quince y treinta horas del día treinta de
Junio de mil novecientos noventitres, compareció a este Primer Juzgado
Militar Permanente de Lima, el Capitán de Infantería Telmo Ricardo HURTADO
HURTADO, comprendido en la presente Causa por el delito de Abuso de Autori-
dad con el agravante del delito de Falsedad, con el fin de ser notificado
con el contenido del Radiograma número dieciocho-R-CSJM de la fecha, median-
te el cual el Consejo Supremo de Justicia Militar le concede el beneficio
de la LIBERACION CONDICIONAL, mediante lectura que se le hizo del citado
Radiograma; disponiendo en consecuencia este Juzgado Militar su inmediata
libertad, cursándose el oficio respectivo al PREBOSTE del Comando de Ins-
trucción y Doctrina del Ejército (COINDE), con conocimiento del Batallón
de Policía Militar número quinientos tres de CHORRILLOS, del Comando del
COINDE, del Comando de Personal del Ejército, del Consejo Supremo de Justi-
cia Militar y del Consejo de Guerra Permanente de la Segunda Zona Judicial
del Ejército; disponiendo asimismo este Juzgado la obligación del sentencia-
do de controlarse cada fin de mes en el Registro respectivo de este despacho
judicial, hasta el cumplimiento de su condena que vencerá el ocho de Mayo de
mil novecientos noventicinco, debiendo dar aviso oportuno de sus cambios de
colocación o ausencias de su Unidad; manifestando el sentenciado encontrarse
actualmente prestando servicios  en la Escuela de Infantería perteneciente
al Comando de Instrucción y Doctrina del Ejército, y estar conforme con el
beneficio de Liberación Condicional concedido; con lo que concluyó la dili-
gencia y leída que le fue al sentenciado, la firmó, después que lo hizo el
señor Juez Militar, por ante mí de lo que certifico.- - - - - - - - - - -

O - 203.17147 - G
JAIME E. GALAN ROJAS
MAY  SJE
J de Militar Permanente

O - 219742861  - B
TELMO HURTADO HURTADO
CAP. INF.

—117768000—
HUGO E. ROMERO DELGADO
Cap. SJE
Secretario Letrado

# EXHIBIT "C"

| 107TH CONGRESS<br>2nd Session | SENATE | EXEC. RPT.<br>107–12 |
|---|---|---|

## EXTRADITION TREATY WITH PERU

OCTOBER 17, 2002.—Ordered to be printed

Mr. BIDEN, from the Committee on Foreign Relations,
submitted the following

# REPORT

[To accompany Treaty Doc. 107–6]

The Committee on Foreign Relations, to which was referred the Extradition Treaty Between the United States of America and the Republic of Peru, signed at Lima on July 26, 2001 (Treaty Doc. 107–6), having considered the same, reports favorably thereon with one understanding and one condition and recommends that the Senate give its advice and consent to the ratification thereof as set forth in this report and the accompanying resolution of advice and consent to ratification.

## CONTENTS

|  | Page |
|---|---|
| I. Purpose | 1 |
| II. Summary and Discussion of Key Provisions | 1 |
| III. Entry Into Force and Termination | 3 |
| IV. Committee Action | 3 |
| V. Committee Comments | 3 |
| VI. Explanation of Extradition Treaty with Peru | 4 |
| VII. Text of Resolution of Advice and Consent to Ratification | 13 |

## I. PURPOSE

The purpose of the Extradition Treaty with Peru (hereafter "the Treaty") is to impose mutual obligations to extradite fugitives at the request of a party subject to conditions set forth in the Treaty.

## II. SUMMARY AND DISCUSSION OF KEY PROVISIONS

The United States is currently a party to over 100 bilateral extradition treaties, including a treaty with Peru which was signed in 1899, and entered into force in 1901 (31 Stat. 1921) (hereafter the "1899 treaty").

19–115 PDF



DEFENDANT'S
EXHIBIT
C

2

The treaty before the Senate is designed to replace, and thereby modernize, the century-old extradition treaty with Peru. It was signed in July 2001 and submitted to the Senate on May 8, 2002.

In general, the Treaty follows a form used in several other bilateral extradition treaties approved by the Senate in recent years. It contains two important features which are not in the 1899 treaty.

First, the Treaty contains a "dual criminality" clause that requires a party to extradite a fugitive whenever the offense is punishable under the laws of both parties by deprivation of liberty for a maximum period of more than one year. This provision replaces the list of offenses specifically identified in the 1899 treaty. This more flexible provision ensures that newly-enacted criminal offenses are covered by the Treaty, thereby obviating the need to amend it as offenses are criminalized by the Parties.

Second, the Treaty provides for extradition of nationals. Specifically, Article III states that extradition "shall not be refused on the ground that the person sought is a national of the Requested State." This contrasts with Article V of the 1899 treaty, which does not obligate a party to extradite its nationals. Many countries of Latin America have, historically, refused to extradite nationals. The United States, by contrast, does extradite its nationals, and has long attempted to convince extradition partners to do likewise.

The Treaty contains several other provisions worth noting.

Consistent with U.S. policy and practice in recent years, the Treaty narrows the political offense exception. The political offense exception (an exception of long-standing in U.S. extradition practice) bars extradition of an individual for offenses of a "political" nature. The Treaty with Peru retains the political offense exception in Article IV(2), but provides that certain crimes shall not be considered political offenses, including murder or other crimes of violence against a Head of State (or his family) of either party, genocide, or offenses for which both parties have an obligation to extradite under a multilateral agreement, such as illicit drug trafficking or terrorism offenses.

The Treaty contains a provision, in Article IV(5), allowing the executive authority of the Requested State to refuse extradition if the person sought would be tried or punished under "extraordinary criminal laws or procedures in the Requesting State." This provision was included at the insistence of the United States, based on concerns at the time of the negotiations over inadequate due process in cases before Peru's special terrorism tribunals. Negotiators for the two parties understood that the language is paragraph 5 was specifically intended to refer to proceedings before these tribunals. According to testimony received from the State Department, these concerns have been "assuaged considerably" since the negotiations, due to the departure of former President Fujimori and subsequent reforms to the Peruvian legal system.

Finally, the Treaty contains a provision related to the death penalty. Under Article V, when extradition is sought for an offense punishable by death in the Requesting State and is not punishable by death in the Requested State, the Requested State may refuse extradition unless the Requesting State provides an assurance that the person sought for extradition will not be executed. This provision is found in many U.S. extradition treaties, as many treaty partners do not impose the death penalty under their laws, and ob-

3

ject to its application to fugitives whom they extradite to the United States.

### III. ENTRY INTO FORCE AND TERMINATION

Under Article XIX, the Treaty enters into force upon the exchange of the instruments of ratification. Either party may terminate the treaty on written notice; termination will be effective six months after the date of such notice.

### IV. COMMITTEE ACTION

The Committee reviewed the Treaty at a public hearing on September 19, 2002, receiving testimony from representatives of the Departments of State and Justice (S. Hrg. 107–721). The Committee considered the Treaty on October 8, 2002, and ordered it favorably reported by voice vote, with the recommendation that the Senate give its advice and consent to the ratification of the Treaty subject to the understanding and the condition set forth in the resolution of advice and consent to ratification.

### V. COMMITTEE COMMENTS

The Committee recommends favorably the Treaty with Peru. It modernizes a treaty that is over a century old, and provides a more flexible "dual criminality" provision which will incorporate a broader range of criminal offenses than is covered under the current treaty with Peru.

According to the State Department's most recent human rights report, "confidence among the Peruvian public in the judiciary is low," and that although the Constitution of Peru provides for an independent judiciary, in practice the judiciary "has been subject to interference from the executive" and is also subject to corruption. The State Department has testified that since the downfall of the Fujimori government in November 2000, Peru has taken steps to correct deficiencies in its judicial system, including by increasing salaries for judges and abolishing an executive committee which former President Fujimori used to influence the judiciary. The State Department testimony noted that under U.S. extradition law and practice, once a fugitive is found extraditable by a U.S. court, the Secretary of State makes the final decision on extradition. As part of that review, the Secretary "takes into account any information available that may affect the defendant's ability to receive a fair trial." The Committee expects that, until judicial reforms have been solidified in Peru, the Secretary will give close scrutiny to all extradition cases to ensure that the defendant is likely to receive adequate due process protections.

Following negotiation of the Rome Statute on the International Criminal Court in 1998, the Committee recommended, in the consideration of extradition treaties, that the Senate include in its resolutions of advice and consent an understanding stating that the Rule of Speciality would bar the retransfer of a fugitive to the International Criminal Court without the consent of the United States. This understanding also provides that the United States would not provide such consent unless it becomes a party to the Court under Article II of the U.S. Constitution. The Rome Statute

4

has now entered into force. The Committee again recommends inclusion of such an understanding. The Committee notes, in this regard, that earlier this year Congress enacted legislation barring U.S. cooperation with the Court, including extradition (Title II of the Supplemental Appropriations Act for Fiscal Year 2002, P.L. 107–206).

Finally, the Committee notes that the State Department expects that parental child abduction will be an extraditable offense under the Treaty. The Committee strongly urges the Departments of Justice and State to seek extradition in such cases with Peru.

## VI. EXPLANATION OF EXTRADITION TREATY WITH PERU

What follows is a technical analysis of the Treaty prepared by the Departments of State and Justice.

### Technical Analysis of the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Peru

On July 26, 2001, the United States signed a new Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Peru to replace a century-old treaty currently in force between them.[1] The new Treaty will be implemented in both the United States and Peru under the procedural framework of existing domestic extradition laws[2] without the need for any new implementing legislation.

The Office of International Affairs, Criminal Division, United States Department of Justice, and the Office of the Legal Adviser, United States Department of State, prepared the following technical analysis of the new Treaty based on their participation in its negotiation.

### ARTICLE I—OBLIGATION TO EXTRADITE

Article I of the Treaty contains a standard provision obligating the United States and Peru to extradite to each other persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for an extraditable offense. By referring to persons wanted "in" the Requesting State, the obligation to extradite applies to fugitives from federal, state, or local justice. This article also makes clear that such obligation extends not only to persons charged with or sentenced for such offenses, but also to persons who have been found guilty but have fled prior to sentencing. Moreover, the negotiating delegations intended that "charged" persons include those who are sought for prosecution for an extraditable offense based on an outstanding warrant of arrest, regardless of whether such warrant was issued pursuant to an indictment, complaint, information, affidavit, or other lawful means for initiating an arrest for prosecution under the laws in Peru or the United States.

---

[1] Signed at Lima November 28, 1899; entered into force February 22, 1901; 31 Stat. 1921; TS 288; 10 Bevans 1074.
[2] For the United States, this is Title 18, United States Code, Section 3184 *et seq.* For Peru, this is the Law of Extradition (Ley de Extradicion, Ley No. 24710 (1987)).

5

## ARTICLE II—EXTRADITABLE OFFENSES

This Article contains standard guidelines for determining which offenses are extraditable. As a general rule, it defines extraditable offenses as those for which the laws of both countries provide a maximum potential penalty of more than one year in prison.[3] In addition to this broad definition, the Article makes clear that extradition shall be granted for conspiring or attempting to commit, or otherwise participating in,[4] the commission of an extraditable offense. Moreover, in determining whether the crime would be punishable under its laws, the Requested State—looking only to the underlying criminal conduct for which extradition is sought—is required to disregard differences in the two countries' categorization of, or terminology used to describe, the offense, as well as certain federal jurisdictional elements, such as use of the mail or telephone, that are peculiar to United States federal law. Finally, this Article provides that, when extradition has been granted for an extraditable offense, it shall also be granted for other less serious offenses with which the person is charged but which, standing alone, would not be extraditable for the sole reason that they are not punishable by more than one year of imprisonment.

Paragraph 3(c) of this Article is particularly important in ensuring that transnational and extraterritorial crimes are extraditable. By providing that an offense will be extraditable regardless of where it was committed, this provision will allow the United States to obtain extradition for violations of U.S. law—including terrorist offenses—initiated or orchestrated from abroad, even if committed entirely outside the territory of the United States, and even if Peruvian law would not recognize jurisdiction over such offenses under the same circumstances.

## ARTICLE III—EXTRADITION OF NATIONALS

Article III provides that extradition shall not be refused on the ground that the person sought is a national of the Requested State. For many years, Peruvian law expressly prohibited the extradition of Peruvian nationals.[5] When Peru updated its extradition law in 1987, this prohibition was omitted, but neither the 1987 law nor the 1899 U.S.-Peru extradition treaty provide any affirmative basis for the extradition of Peruvian nationals.[6] This Article now provides such an affirmative obligation and will ensure the ability of the United States to extradite fugitives from Peru regardless of their nationality.

---

[3] During the negotiations, the Peruvian delegation indicated that, under Peruvian law, key offenses such as drug trafficking (including CCE), money laundering, terrorism, and organized criminal activity (RICO), as well as certain tax, export, and environmental crimes, would meet the requirements of Article II(1) and thus be extraditable offenses.

[4] The negotiating delegations intended that "participation in" an offense includes, at a minimum, being an accessory before or after the fact, or aiding, abetting, counseling, commanding, inducing, or procuring the commission of an offense. *See* 18 U.S.C §§2 and 3.

[5] Article 3(1) of Extradition Law of October 23, 1888: "Extradition will not be granted in any case . . . [w]hen the individual whose extradition has been requested is a Peruvian citizen by birth or is a citizen naturalized before the act was committed which motivated the petition for extradition."

[6] Article V of the 1899 treaty states that "[n]either of the contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this treaty."

6

ARTICLE IV—BASES FOR DENIAL OF EXTRADITION

This Article sets forth several bases under which the Requested State may deny extradition. For the most part, it contains standard treaty language that has been drawn as narrowly as possible in order to comport with the treaty's overarching goal of facilitating, rather than hindering, extradition in the vast majority of cases.

Paragraph 1(a) contains standard "double jeopardy" or non bis in idem language prohibiting extradition if the person sought has been convicted or acquitted in the Requested State for the same offense for which extradition is requested.[7] This provision will permit extradition in situations in which the fugitive is charged with different offenses in both countries arising out of the same basic illegal transaction. In addition, this provision makes clear that extradition will not be precluded by the fact that the Requested State's authorities have declined to prosecute, or have discontinued criminal proceedings against, the person sought for the same offense for which extradition is requested.

Paragraph 1(b) of this Article prohibits extradition if the prosecution or punishment for the offense for which extradition is sought is barred by the statute of limitations of the Requesting State. This language is an improvement over provisions applying the Requested State's statute of limitations, like that contained in the 1899 extradition treaty in force between the United States and Peru.[8] From the modern viewpoint of the United States, the Requested State's statute of limitations should have no relevance to offenses committed against the laws of the Requesting State. Like many countries throughout the world, Peruvian law includes time limitations not only within which a person must be prosecuted, but also within which a sentence must be served. Unlike the United States, all offenses, even murder, are subject to prescriptive periods, which correspond to the maximum applicable penalty for the offense, but which in no case exceed 30 years. Moreover, although Peruvian law sets forth certain circumstances under which the running of the prescription period is interrupted, it is not, as under United States law, met simply upon the filing of an indictment or suspended for such time as the defendant remains a fugitive. Accordingly, the inapplicability of the Peruvian statute of limitations to offenses that are the subject of U.S. extradition requests should significantly limit potential grounds for denial of extradition.

Paragraph 2 of this Article sets forth a standard political offense exception to extradition. The language used in this Article is typical in that it does not attempt to define what constitutes a political offense, leaving it to the courts of the Requested State to determine, based solely on domestic law, whether a particular extradition request should be denied on this basis.[9] This Article, however, does set forth certain offenses that are not to be considered

---

[7] The express use of the phrase "convicted or acquitted" in this paragraph prevents the Requested State from refusing extradition on the basis that it has unilaterally immunized the fugitive from prosecution by pardon or granting of clemency. Moreover, nothing in this provision enables the Requested State to bar extradition on the ground that the person sought has been convicted or acquitted in a third State.

[8] Article VII of the 1899 Treaty.

[9] Generally, United States law recognizes two categories of political offenses: (1) "pure" political offenses, such as treason, sedition and espionage, which are directed solely against the integrity of the State; and (2) in more limited circumstances, certain so-called "relative" political offenses, i.e., those containing elements of common crimes, but which are committed as means to political ends or closely linked with political events.

7

political offenses. These include: (1) a violent crime against the Head of State of the United States or Peru or members of their families; (2) terrorism, genocide, drug trafficking, and other offenses as defined in multilateral conventions to which both the United States and Peru are parties;[10] and (3) a conspiracy or attempt to commit, or participation in any of the above offenses.

Paragraph 3 states that extradition shall not be granted if the executive authority of the Requested State determines that the extradition request was politically motivated. This provision applies when the offense for which extradition has been requested does not fall within the definition of a political offense, but it is shown that the extradition request is for the actual purpose of punishing the person sought for political reasons. Under U.S. law and practice, a claim that the extradition request was politically motivated, unlike a claim involving the political offense exception, falls outside the scope of judicial review and is exclusively for the executive branch (i.e., the Secretary of State) to consider and decide.

Paragraph 4 of this Article is a standard provision stating that the Requested State may refuse extradition if the request relates to an offense under military law that would not be an offense under ordinary criminal law, such as desertion or disobedience of orders. This provision makes clear that the decision whether to grant or refuse an extradition request based on a military offense is one exclusively in the discretion of the executive branch.

Paragraph 5 of this Article gives the executive authority of the Requested State discretion to deny an extradition request when the person sought will be or has been tried under extraordinary laws or procedures in the Requesting State. This provision was included at the instance of the United States based on concerns at the time of the negotiations over due process issues in cases that were brought before Peru's special terrorism tribunals. Since the negotiations, those concerns have been assuaged considerably by the departure of former president Fujimori, subsequent reforms to the Peruvian legal system and the decline in the use of such special terrorism tribunals in Peru. In fact, some cases originally tried in special terrorism tribunals have been retried recently in the civilian court system. In any event, because it is discretionary, this provision is designed to give the executive branch of the Requested State sufficient flexibility so as not to frustrate the treaty's primary goal of bringing fugitives to justice. In the rare case in which this provision might apply, the Requested State could nevertheless agree to extradition, for example, upon being satisfied that the Requesting State has adopted adequate procedures to safeguard the due process rights of the accused.

---

[10] Examples of conventions to which this clause would apply at present include: the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, (done at New York, December 14, 1973; entered into force February 20, 1977 (28 UST 1975; TIAS 8532; 1035 UNTS 167)); the Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking) (done at The Hague December 16, 1970; entered into force October 14, 1971 (22 UST 1641; TIAS 7192)); the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation (Sabotage) (done at Montreal September 23, 1971; entered into force January 26, 1973 (24 UST 564; TIAS 7570)); the International Convention for the Suppression of Terrorist Bombings (done at New York December 15, 1997; entered into force for the United States July 26, 2002 (Treaty Doc. 106–6)); the International Convention for the Suppression of the Financing of Terrorism (done at New York December 9, 1999; entered into force for the United States July 26, 2002 (Treaty Doc. 106–49)); and the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (done at Vienna December 20, 1988; entered into force November 11, 1990).

8

### ARTICLE V—DEATH PENALTY

Paragraph 1 of this Article gives the Requested State the discretion to refuse extradition in cases in which the offense for which extradition is sought is punishable by death in the Requesting State, but is not punishable by such penalty in the Requested State, unless the Requesting State provides an assurance that the person sought will not be executed. This is a common provision in U.S. extradition treaties with countries, like Peru, that insist on its inclusion based on the abolition or severe restriction of the death penalty under their laws. Peru's constitution prohibits the death penalty as a punishment for all crimes except terrorism and treason. [11]

Paragraph 2 of this Article provides that, aside from the death penalty, extradition cannot be denied nor subjected to conditions on the basis that the penalty for the offense is greater in the Requesting State than in the Requested State. This provision is designed to make clear that the Requested State cannot impose penalty-related conditions that are outside the scope of the express provisions in paragraph 1 of this Article. This provision was included at the request of the United States in response to a recent trend during which a number of countries sought assurances relating to sentences of life imprisonment, as well as those imposed for terms of years, when there was no basis in the applicable treaty for making such a demand.

### ARTICLE VI—EXTRADITION PROCEDURES AND REQUIRED DOCUMENTS

This Article contains standard provisions setting forth the appropriate means of transmitting an extradition request and the required documentation and evidence to be submitted in support thereof.

Paragraph 1 of this Article requires that all requests for extradition be submitted in writing through the diplomatic channel. Paragraph 2 outlines the information that must accompany every request for extradition under the Treaty. Paragraph 3 describes the information needed, in addition to the requirements of paragraph 2, when the person is sought for prosecution in the Requesting State. Paragraph 4 describes the information needed, in addition to the requirements of paragraph 2, when the person sought has already been convicted in the Requesting State. Paragraph 5 allows the Requested State to seek, if necessary, supplemental information from the Requesting State within a designated period of time.

Among the documentation required in support of a request for the extradition of a person charged with, but not yet convicted of, a crime is evidence "sufficient to justify the committal for trial" of the person sought if the offense had been committed in the Requested State. This provision is consistent with fundamental extradition jurisprudence in the United States and will be interpreted by U.S. courts to require that Peru provide evidence sufficient to establish "probable cause" that an extraditable crime was committed by the person sought. The Peruvian delegation explained

---

[11] Article 140, Political Constitution of Peru (1993). With respect to these two offenses, this Article would not restrict extradition requests for comparable crimes punishable by death under U.S. law. *See* 18 U.S.C. §§2381 and 2331 *et seq.*

9

that, in accordance with Peruvian law, Peruvian courts would apply a comparable standard of proof to U.S. requests.

In regard to persons who already have been found guilty of the offense for which extradition is sought, no showing of probable cause is required. The Requesting State need provide only a copy of the judgment of conviction and such evidence establishing that the person sought is the person to whom the conviction refers.

ARTICLE VII—TRANSLATION AND ADMISSIBILITY OF DOCUMENTS

This Article contains a standard treaty provision requiring that all documents submitted in support of an extradition request be translated into the language of the Requested State (Spanish for Peru and English for the United States). It also provides that properly certified and authenticated documents accompanying an extradition request shall be accepted as evidence in extradition proceedings.[12]

ARTICLE VIII—PROVISIONAL ARREST

This Article contains standard language describing the process by which a person may be arrested and detained in the Requested State while the extradition documents required by Article VI are being prepared and translated in the Requesting State.

Provisional arrest serves the interests of justice by allowing for the apprehension of fugitives who, for example, pose a danger to the community or a risk of flight. Fleeing fugitives often do not stay in one place for any significant period of time, and frequently for less time than it takes to prepare and translate formal extradition documentation. Moreover, the ability to immediately arrest dangerous criminals obviates risks to the safety of the citizenry of the requested country by denying such criminals the opportunity to continue to engage in illegal activity while the full extradition documentation is being prepared.

This Article also contains certain provisions to protect against capricious or unjustified use of provisional arrest authority. For example, it provides that provisional arrest may be effected only under urgent circumstances, requires that a valid warrant for the fugitive's arrest or a finding of guilt or judgment of conviction exist in the Requesting State, and imposes a 60-day time limit within which the formal extradition documentation must be presented to the executive authority of requested country or the person sought may be released from custody. The Article also makes clear, however, that the release of the person sought because of a missed deadline will not preclude the re-arrest of, and re-commencement of extradition proceedings against, the person sought if the formal request and supporting documentation are received at a later date.

ARTICLE IX—DECISION ON THE EXTRADITION REQUEST AND SURRENDER OF THE PERSON SOUGHT

This Article contains standard language concerning the Requested State's obligation to notify the Requesting State of its deci-

---

[12] *See* Title 18, United States Code, Section 3190, for traditional means of authenticating extradition documentation. This provision also has the added flexibility of allowing the admissibility of documents that have been certified or authenticated in other ways accepted by the laws in the Requested State.

10

sion on an extradition request and to provide an explanation if the request is denied. It also contains standard provisions concerning arrangements for surrendering the person sought to authorities of the Requesting State and consequences if the Requesting State fails to remove the person within the required time.

#### ARTICLE X—DEFERRED AND TEMPORARY SURRENDER

In the event that the person sought by the Requesting State is being prosecuted or serving a sentence in the Requested State, this Article allows the Requested State to postpone the extradition proceedings and surrender of that person until the conclusion of its own prosecution or the completion of the service of any sentence imposed as a result thereof. As an alternative, the Requested State may temporarily surrender the person for prosecution in the Requesting State.

Under the terms of this Article, a person temporarily surrendered will be kept in custody while in the Requesting State and will be returned to the Requested State at the conclusion of the proceedings in the Requesting State. Such temporary surrender furthers the interests of justice in that it permits the Requesting State to try the person sought while evidence and witnesses are more likely to be available, thereby increasing the likelihood of successful prosecution. Such transfer may also be advantageous to the person sought in that: (1) he or she might resolve all outstanding charges sooner; (2) subject to the laws of each State, he or she may be able to serve concurrently the sentences imposed by the Requesting and Requested States; and (3) he or she can defend against the charges while favorable evidence is fresh and more likely to be available to the defense.

#### ARTICLE XI—CONCURRENT REQUESTS

When the Requested State has received an extradition request under this treaty, and also has received a request for the same person from one or more other countries, this Article sets forth standard factors to be considered by the Requested State in determining to which country it will surrender the person sought.

#### ARTICLE XII—SEIZURE AND SURRENDER OF PROPERTY

At the time of their arrest in the Requested State, persons are often in possession of property that is connected in some way to the offense for which extradition is sought. This Article allows such property to be surrendered to the Requesting State upon extradition, so that the property may be used as evidence at trial, returned to the victims, or otherwise disposed of appropriately. The Requested State, however, may condition the surrender of the property upon assurances from the Requesting State that such property will be returned to the Requested State as soon as practicable, and this Article provides that the rights of third parties in such property shall be respected.

#### ARTICLE XIII—RULE OF SPECIALITY

This Article contains standard provisions relating to the rule of speciality, which, in general terms, prohibits the prosecution of an extraditee for offenses other than those for which extradition was

11

granted. By limiting prosecution to those offenses for which extradition was granted, the rule is intended to prevent a request for extradition from being used as a ploy—for example, to obtain custody of a person for trial or service of sentence on different charges that would not be extraditable under the Treaty. Paragraph 1 of this article also sets forth several standard exceptions to the general rule which allow the Requesting State to pursue: (1) lesser included or differently denominated offenses based on the same facts as the crime for which extradition was granted;[13] (2) an offense committed after extradition;[14] or (3) any offense for which the Requested State gives consent.[15] Paragraph 2 of this Article prohibits the Requesting State from surrendering the person to a third State for a crime committed prior to extradition under this Treaty without the consent of the State from which extradition was first obtained.[16] Finally, paragraph 3 permits the detention, trial, or punishment of an extraditee for offenses other than those for which extradition was granted, or the extradition of that person to a third State, if: (1) the extraditee leaves the Requesting State and voluntarily returns to it; or (2) the extraditee does not leave the Requesting State within ten days of being free to do so.[17]

ARTICLE XIV—SIMPLIFIED PROCEDURE FOR SURRENDER

This Article contains a standard provision allowing, upon his or her consent, the expeditious surrender of the person sought to the Requesting State without further proceedings. Persons sought for extradition frequently elect to expedite their return to the Requesting State under such provisions in order to resolve the charges against them and to spend as little time as possible in custody in the Requested State. Expedited surrender also saves the judicial and law enforcement authorities of the Requested State the significant expense associated with prolonged extradition proceedings. In cases where a person has waived further proceedings, and along with them protections in the treaty and applicable extradition statutes, the process is not deemed an "extradition," and therefore the rule of speciality in Article XIII does not apply.

---

[13] Allowing the Requesting State to proceed on such crimes does not offend the purpose of the rule of speciality, since the Requested State will have already considered the facts upon which both the original and the new charges are based and determined that the acts constituting the offenses are extraditable.

[14] The rule of speciality does not provide the defendant with any immunity for offenses committed after his or her surrender to the Requesting State.

[15] The consent exception to the rule of speciality recognizes that, as a Party to the Treaty, the Requested State has a right to waive certain of its benefits or privileges under the Treaty. The Requested State's consent, when no other exception applies, can prevent an injustice by allowing, for example, the prosecution of an extraditee who (the Requesting State does not discover until after extradition) was the perpetrator of a previously unsolved crime that was committed prior to the extradition from the Requested State and is completely separate and distinct from the offense for which extradition was sought. In the United States, the Secretary of State has the authority to consent.

[16] This provision prohibiting re-extradition is intended to prevent the State to which a person is extradited from subsequently extraditing the person to a third State to which the Requested State would not have agreed to extradite. It is expected that this provision also would apply to situations involving any international tribunal located in a third State. This provision thus enables the Requested State to retain a measure of control over the ultimate destination of the person surrendered. A similar provision is contained in all recent U.S. extradition treaties.

[17] This provision recognizes that an extraditee should not be allowed to benefit from the rule of speciality indefinitely and remain in or return to the Requesting State with impunity. In effect, if the extraditee chooses to return to or remain in the Requesting State, he or she relinquishes the benefits of the rule.

12

### Article XV—Transit

At times, law enforcement authorities escorting a surrendered person back to the State where he or she is wanted for trial or punishment are unable to take such person directly from the surrendering State to the receiving State and must make a stop, scheduled or unscheduled, in a third State. This Article contains standard provisions authorizing such transits in those situations in which one Party to this Treaty is the receiving State and the other Party is the State through which the surrendered person must transit.

### Article XVI—Representation and Expenses

This Article provides that the Requested State shall advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in extradition proceedings. Such representation ensures that the Requested State abides by its obligation under the Treaty to secure the return of every extraditable criminal to the Requesting State. By participating in the extradition proceedings, the governments also have the opportunity to shape extradition law and practice in a way that is beneficial to both themselves and their treaty partners. Pursuant to a February 15, 1990, exchange of diplomatic notes, the United States and Peru already provide representation to each other in extradition cases and, with this provision, intend to continue the current practice. In accordance with established practice, the Department of Justice will represent Peru in all aspects of extradition proceedings in the United States. Likewise, prosecutors from the Peruvian Public Ministry will represent the interests of the United States in such proceedings in Peru.

This Article also contains standard provisions regarding extradition-related expenses and pecuniary claims against the Parties.

### Article XVII—Consultation

This standard Article serves the interests of the United States by promoting close cooperation with our foreign counterparts on extradition issues. It allows the U.S. Department of Justice and Peruvian Ministry of Justice to consult with each other directly in connection with the processing of individual extradition cases and in furtherance of maintaining and improving procedures for the implementation of the Treaty.

### Article XVIII—Application

This Article makes clear that the Treaty applies to offenses that occurred before, as well as after, it enters into force. The retroactive application of extradition treaties does not violate the ex post facto clause of the U.S. Constitution,[18] because extradition treaties do not criminalize any act. They merely provide a means by which persons who committed acts that were criminal offenses in both countries at the time of their commission can be held to answer for those offenses.[19] Provisions such as this Article ensure that large classes of criminals are not immunized from prosecution

---

[18] U.S. Const., art. I, §9, cl. 3.
[19] *See In re De Giacomo*, 7 F.Cas. 366 (C.C.N.Y. 1874); *See also* 4 Moore, A Digest of International Law 268 (1906).

13

and allowed impunity merely by virtue of the fact that they committed their offenses prior to the entry into force of a particular bilateral extradition treaty.

### ARTICLE XIX—FINAL CLAUSES

This Article contains standard treaty provisions regarding the ratification, entry into force, and termination of the Treaty.

### VII. TEXT OF RESOLUTION OF ADVICE AND CONSENT TO RATIFICATION

*Resolved (two-thirds of the Senators present concurring therein),*

**SECTION 1. ADVICE AND CONSENT TO RATIFICATION OF THE EXTRA-DITION TREATY WITH PERU, SUBJECT TO AN UNDER-STANDING AND A CONDITION.**

The Senate advises and consents to the ratification of the Extradition Treaty Between the United States of America and the Republic of Peru, signed at Lima on July 26, 2001 (Treaty Doc. 107–6; in this resolution referred to as the "Treaty"), subject to the understanding in section 2 and the condition in section 3.

**SEC. 2. UNDERSTANDING.**

The advice and consent of the Senate under section 1 is subject to the following understanding, which shall be included in the instrument of ratification:

PROHIBITION OF EXTRADITION TO THE INTERNATIONAL CRIMINAL COURT.—The United States understands that the protections contained in Article XIII concerning the Rule of Speciality would preclude the resurrender of any person extradited to the Republic of Peru from the United States to the International Criminal Court, unless the United States consents to such resurrender; and the United States shall not consent to any such resurrender unless the Statute establishing that Court has entered into force for the United States by and with the advice and consent of the Senate in accordance with Article II, section 2 of the United States Constitution.

**SEC. 3. CONDITION.**

The advice and consent of the Senate under section 1 is subject to the condition that nothing in the Treaty requires or authorizes legislation or other action by the United States that is prohibited by the Constitution of the United States as interpreted by the United States.

○

# EXHIBIT "D"

### 3. International Covenant on Civil and Political Rights

Adopted and opened for signature, ratification and accession by General Assembly resolution 2200 A (XXI) of 16 December 1966

ENTRY INTO FORCE: 23 March 1976, in accordance with article 49.

PREAMBLE

*The States Parties to the present Covenant,*

*Considering* that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

*Recognizing* that these rights derive from the inherent dignity of the human person,

*Recognizing* that, in accordance with the Universal Declaration of Human Rights, the ideal of free human beings enjoying civil and political freedom and freedom from fear and want can only be achieved if conditions are created whereby everyone may enjoy his civil and political rights, as well as his economic, social and cultural rights,

*Considering* the obligation of States under the Charter of the United Nations to promote universal respect for, and observance of, human rights and freedoms,

*Realizing* that the individual, having duties to other individuals and to the community to which he belongs, is under a responsibility to strive for the promotion and observance of the rights recognized in the present Covenant,

*Agree* upon the following articles:

#### PART I

*Article 1*

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

2. All peoples may, for their own ends, freely dispose of their natural wealth and resources without prejudice to any obligations arising out of international economic co-operation, based upon the principle of mutual benefit, and international law. In no case may a people be deprived of its own means of subsistence.

3. The States Parties to the present Covenant, including those having responsibility for the administration of Non-Self-Governing and Trust Territories, shall promote the realization of the right of self-determination, and shall respect that right, in conformity with the provisions of the Charter of the United Nations.

#### PART II

*Article 2*

1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2. Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3. Each State Party to the present Covenant undertakes:

(*a*) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(*b*) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(*c*) To ensure that the competent authorities shall enforce such remedies when granted.

*Article 3*

The States Parties to the present Covenant undertake to ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant.

*Article 4*

1. In time of public emergency which threatens the life of the nation and the existence of which is officially proclaimed, the States Parties to the present Covenant may take measures derogating from their obligations under the present Covenant to the extent strictly required by the exigencies of the situation, provided that such measures are not inconsistent with their other obligations under international law and do not involve

8



discrimination solely on the ground of race, colour, sex, language, religion or social origin.

2. No derogation from articles 6, 7, 8 (paragraphs 1 and 2), 11, 15, 16 and 18 may be made under this provision.

3. Any State Party to the present Covenant availing itself of the right of derogation shall immediately inform the other States Parties to the present Covenant, through the intermediary of the Secretary-General of the United Nations, of the provisions from which it has derogated and of the reasons by which it was actuated. A further communication shall be made, through the same intermediary, on the date on which it terminates such derogation.

### Article 5

1. Nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant.

2. There shall be no restriction upon or derogation from any of the fundamental human rights recognized or existing in any State Party to the present Covenant pursuant to law, conventions, regulations or custom on the pretext that the present Covenant does not recognize such rights or that it recognizes them to a lesser extent.

### PART III

### Article 6

1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

2. In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the Crime of Genocide. This penalty can only be carried out pursuant to a final judgement rendered by a competent court.

3. When deprivation of life constitutes the crime of genocide, it is understood that nothing in this article shall authorize any State Party to the present Covenant to derogate in any way from any obligation assumed under the provisions of the Convention on the Prevention and Punishment of the Crime of Genocide.

4. Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

5. Sentence of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women.

6. Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

### Article 7

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

### Article 8

1. No one shall be held in slavery; slavery and the slave-trade in all their forms shall be prohibited.

2. No one shall be held in servitude.

3. (a) No one shall be required to perform forced or compulsory labour;

(b) Paragraph 3 (a) shall not be held to preclude, in countries where imprisonment with hard labour may be imposed as a punishment for a crime, the performance of hard labour in pursuance of a sentence to such punishment by a competent court;

(c) For the purpose of this paragraph the term "forced or compulsory labour" shall not include:

(i) Any work or service, not referred to in subparagraph (b), normally required of a person who is under detention in consequence of a lawful order of a court, or of a person during conditional release from such detention;

(ii) Any service of a military character and, in countries where conscientious objection is recognized, any national service required by law of conscientious objectors;

(iii) Any service exacted in cases of emergency or calamity threatening the life or well-being of the community;

(iv) Any work or service which forms part of normal civil obligations.

### Article 9

1. Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

2. Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him.

3. Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgement.

4. Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

5. Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation.

9

*Article 7*

1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

2. (a) Accused persons shall, save in exceptional circumstances, be segregated from convicted persons and shall be subject to separate treatment appropriate to their status as unconvicted persons;

(b) Accused juvenile persons shall be separated from adults and brought as speedily as possible for adjudication.

3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status.

*Article 11*

No one shall be imprisoned merely on the ground of inability to fulfil a contractual obligation.

*Article 12*

1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence.

2. Everyone shall be free to leave any country, including his own.

3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law, are necessary to protect national security, public order (*ordre public*), public health or morals or the rights and freedoms of others, and are consistent with the other rights recognized in the present Covenant.

4. No one shall be arbitrarily deprived of the right to enter his own country.

*Article 13*

An alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.

*Article 14*

1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The Press and the public may be excluded from all or part of a trial for reasons of morals, public order (*ordre public*) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.

2. Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality:

(a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(b) To have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing;

(c) To be tried without undue delay;

(d) To be tried in his presence, and to defend himself in person or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(e) To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

(f) To have the free assistance of an interpreter if he cannot understand or speak the language used in court;

(g) Not to be compelled to testify against himself or to confess guilt.

4. In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

5. Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

6. When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him.

7. No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

*Article 15*

1. No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international

10

law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time when the criminal offence was committed. If, subsequent to the commission of the offence, provision is made by law for the imposition of the lighter penalty, the offender shall benefit thereby.

2. Nothing in this article shall prejudice the trial and punishment of any person for any act or omission which, at the time when it was committed, was criminal according to the general principles of law recognized by the community of nations.

### Article 16

Everyone shall have the right to recognition everywhere as a person before the law.

### Article 17

1. No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation.

2. Everyone has the right to the protection of the law against such interference or attacks.

### Article 18

1. Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.

2. No one shall be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice.

3. Freedom to manifest one's religion or beliefs may be subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others.

4. The States Parties to the present Covenant undertake to have respect for the liberty of parents and, when applicable, legal guardians to ensure the religious and moral education of their children in conformity with their own convictions.

### Article 19

1. Everyone shall have the right to hold opinions without interference.

2. Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.

3. The exercise of the rights provided for in paragraph 2 of this article carries with it special duties and responsibilities. It may therefore be subject to certain

restrictions, but these shall only be such as are provided by law and are necessary:

(a) For respect of the rights or reputations of others;

(b) For the protection of national security or of public order (*ordre public*), or of public health or morals.

### Article 20

1. Any propaganda for war shall be prohibited by law.

2. Any advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law.

### Article 21

The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others.

### Article 22

1. Everyone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interests.

2. No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others. This article shall not prevent the imposition of lawful restrictions on members of the armed forces and of the police in their exercise of this right.

3. Nothing in this article shall authorize States Parties to the International Labour Organisation Convention of 1948 concerning Freedom of Association and Protection of the Right to Organize to take legislative measures which would prejudice, or to apply the law in such a manner as to prejudice the guarantees provided for in that Convention.

### Article 23

1. The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

2. The right of men and women of marriageable age to marry and to found a family shall be recognized.

3. No marriage shall be entered into without the free and full consent of the intending spouses.

4. States Parties to the present Covenant shall take appropriate steps to ensure equality of rights and responsibilities of spouses as to marriage, during marriage and at its dissolution. In the case of dissolution, provision shall be made for the necessary protection of any children.

### Article 24

1. Every child shall have, without any discrimination as to race, colour, sex, language, religion, national

11

or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State.

2. Every child shall be registered immediately after birth and shall have a name.

3. Every child has the right to acquire a nationality.

### Article 25

Every citizen shall have the right and the opportunity, without any of the distinctions mentioned in article 2 and without unreasonable restrictions:

(a) To take part in the conduct of public affairs, directly or through freely chosen representatives;

(b) To vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors;

(c) To have access, on general terms of equality, to public service in his country.

### Article 26

All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

### Article 27

In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language.

### PART IV

### Article 28

1. There shall be established a Human Rights Committee (hereafter referred to in the present Covenant as the Committee). It shall consist of eighteen members and shall carry out the functions hereinafter provided.

2. The Committee shall be composed of nationals of the States Parties to the present Covenant who shall be persons of high moral character and recognized competence in the field of human rights, consideration being given to the usefulness of the participation of some persons having legal experience.

3. The members of the Committee shall be elected and shall serve in their personal capacity.

### Article 29

1. The members of the Committee shall be elected by secret ballot from a list of persons possessing the qualifications prescribed in article 28 and nominated

for the purpose by the States Parties to the present Covenant.

2. Each State Party to the present Covenant may nominate not more than two persons. These persons shall be nationals of the nominating State.

3. A person shall be eligible for renomination.

### Article 30

1. The initial election shall be held no later than six months after the date of the entry into force of the present Covenant.

2. At least four months before the date of each election to the Committee, other than an election to fill a vacancy declared in accordance with article 34, the Secretary-General of the United Nations shall address a written invitation to the States Parties to the present Covenant to submit their nominations for membership of the Committee within three months.

3. The Secretary-General of the United Nations shall prepare a list in alphabetical order of all the persons thus nominated, with an indication of the States Parties which have nominated them, and shall submit it to the States Parties to the present Covenant no later than one month before the date of each election.

4. Elections of the members of the Committee shall be held at a meeting of the States Parties to the present Covenant convened by the Secretary-General of the United Nations at the Headquarters of the United Nations. At that meeting, for which two thirds of the States Parties to the present Covenant shall constitute a quorum, the persons elected to the Committee shall be those nominees who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

### Article 31

1. The Committee may not include more than one national of the same State.

2. In the election of the Committee, consideration shall be given to equitable geographical distribution of membership and to the representation of the different forms of civilization and of the principal legal systems.

### Article 32

1. The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. However, the terms of nine of the members elected at the first election shall expire at the end of two years; immediately after the first election, the names of these nine members shall be chosen by lot by the Chairman of the meeting referred to in article 30, paragraph 4.

2. Elections at the expiry of office shall be held in accordance with the preceding articles of this part of the present Covenant.

### Article 33

1. If, in the unanimous opinion of the other members, a member of the Committee has ceased to carry

12

out his functions for any cause other than absence of a temporary character, the Chairman of the Committee shall notify the Secretary-General of the United Nations, who shall then declare the seat of that member to be vacant.

2. In the event of the death or the resignation of a member of the Committee, the Chairman shall immediately notify the Secretary-General of the United Nations, who shall declare the seat vacant from the date of death or the date on which the resignation takes effect.

### Article 34

1. When a vacancy is declared in accordance with article 33 and if the term of office of the member to be replaced does not expire within six months of the declaration of the vacancy, the Secretary-General of the United Nations shall notify each of the States Parties to the present Covenant, which may within two months submit nominations in accordance with article 29 for the purpose of filling the vacancy.

2. The Secretary-General of the United Nations shall prepare a list in alphabetical order of the persons thus nominated and shall submit it to the States Parties to the present Covenant. The election to fill the vacancy shall then take place in accordance with the relevant provisions of this part of the present Covenant.

3. A member of the Committee elected to fill a vacancy declared in accordance with article 33 shall hold office for the remainder of the term of the member who vacated the seat on the Committee under the provisions of that article.

### Article 35

The members of the Committee shall, with the approval of the General Assembly of the United Nations, receive emoluments from United Nations resources on such terms and conditions as the General Assembly may decide, having regard to the importance of the Committee's responsibilities.

### Article 36

The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under the present Covenant.

### Article 37

1. The Secretary-General of the United Nations shall convene the initial meeting of the Committee at the Headquarters of the United Nations.

2. After its initial meeting, the Committee shall meet at such times as shall be provided in its rules of procedure.

3. The Committee shall normally meet at the Headquarters of the United Nations or at the United Nations Office at Geneva.

### Article 38

Every member of the Committee shall, before taking up his duties, make a solemn declaration in open com-

mittee that he will perform his functions impartially and conscientiously.

### Article 39

1. The Committee shall elect its officers for a term of two years. They may be re-elected.

2. The Committee shall establish its own rules of procedure, but these rules shall provide, *inter alia*, that:

(a) Twelve members shall constitute a quorum;

(b) Decisions of the Committee shall be made by a majority vote of the members present.

### Article 40

1. The States Parties to the present Covenant undertake to submit reports on the measures they have adopted which give effect to the rights recognized herein and on the progress made in the enjoyment of those rights:

(a) Within one year of the entry into force of the present Covenant for the States Parties concerned;

(b) Thereafter whenever the Committee so requests.

2. All reports shall be submitted to the Secretary-General of the United Nations, who shall transmit them to the Committee for consideration. Reports shall indicate the factors and difficulties, if any, affecting the implementation of the present Covenant.

3. The Secretary-General of the United Nations may, after consultation with the Committee, transmit to the specialized agencies concerned copies of such parts of the reports as may fall within their field of competence.

4. The Committee shall study the reports submitted by the States Parties to the present Covenant. It shall transmit its reports, and such general comments as it may consider appropriate, to the States Parties. The Committee may also transmit to the Economic and Social Council these comments along with the copies of the reports it has received from States Parties to the present Covenant.

5. The States Parties to the present Covenant may submit to the Committee observations on any comments that may be made in accordance with paragraph 4 of this article.

### Article 41

1. A State Party to the present Covenant may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under the present Covenant. Communications under this article may be received and considered only if submitted by a State Party which has made a declaration recognizing in regard to itself the competence of the Committee. No communication shall be received by the Committee if it concerns a State Party which has not made such a declaration. Communications received under this article shall be dealt with in accordance with the following procedure:

(a) If a State Party to the present Covenant considers that another State Party is not giving effect to the provisions of the present Covenant, it may, by written

13

communication, bring the matter to the attention of that State Party. Within three months after the receipt of the communication the receiving State shall afford the State which sent the communication an explanation, or any other statement in writing clarifying the matter which should include, to the extent possible and pertinent, reference to domestic procedures and remedies taken, pending, or available in the matter.

(b) If the matter is not adjusted to the satisfaction of both States Parties concerned within six months after the receipt by the receiving State of the initial communication, either State shall have the right to refer the matter to the Committee, by notice given to the Committee and to the other State.

(c) The Committee shall deal with a matter referred to it only after it has ascertained that all available domestic remedies have been invoked and exhausted in the matter, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged.

(d) The Committee shall hold closed meetings when examining communications under this article.

(e) Subject to the provisions of sub-paragraph (c), the Committee shall make available its good offices to the States Parties concerned with a view to a friendly solution of the matter on the basis of respect for human rights and fundamental freedoms as recognized in the present Covenant.

(f) In any matter referred to it, the Committee may call upon the States Parties concerned, referred to in sub-paragraph (b), to supply any relevant information.

(g) The States Parties concerned, referred to in sub-paragraph (b), shall have the right to be represented when the matter is being considered in the Committee and to make submissions orally and/or in writing.

(h) The Committee shall, within twelve months after the date of receipt of notice under sub-paragraph (b), submit a report:

(i) If a solution within the terms of sub-paragraph (e) is reached, the Committee shall confine its report to a brief statement of the facts and of the solution reached;

(ii) If a solution within the terms of sub-paragraph (e) is not reached, the Committee shall confine its report to a brief statement of the facts; the written submissions and record of the oral submissions made by the States Parties concerned shall be attached to the report.

In every matter, the report shall be communicated to the States Parties concerned.

2. The provisions of this article shall come into force when ten States Parties to the present Covenant have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the subject of a communication already

transmitted under this article; no further communication by any State Party shall be received after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party concerned has made a new declaration.

*Article 42*

1. (a) If a matter referred to the Committee in accordance with article 41 is not resolved to the satisfaction of the States Parties concerned, the Committee may, with the prior consent of the States Parties concerned, appoint an *ad hoc* Conciliation Commission (hereinafter referred to as the Commission). The good offices of the Commission shall be made available to the States Parties concerned with a view to an amicable solution of the matter on the basis of respect for the present Covenant;

(b) The Commission shall consist of five persons acceptable to the States Parties concerned. If the States Parties concerned fail to reach agreement within three months on all or part of the composition of the Commission, the members of the Commission concerning whom no agreement has been reached shall be elected by secret ballot by a two-thirds majority vote of the Committee from among its members.

2. The members of the Commission shall serve in their personal capacity. They shall not be nationals of the States Parties concerned, or of a State not party to the present Covenant, or of a State Party which has not made a declaration under article 41.

3. The Commission shall elect its own Chairman and adopt its own rules of procedure.

4. The meetings of the Commission shall normally be held at the Headquarters of the United Nations or at the United Nations Office at Geneva. However, they may be held at such other convenient places as the Commission may determine in consultation with the Secretary-General of the United Nations and the States Parties concerned.

5. The secretariat provided in accordance with article 36 shall also service the commissions appointed under this article.

6. The information received and collated by the Committee shall be made available to the Commission and the Commission may call upon the States Parties concerned to supply any other relevant information.

7. When the Commission has fully considered the matter, but in any event not later than twelve months after having been seized of the matter, it shall submit to the Chairman of the Committee a report for communication to the States Parties concerned:

(a) If the Commission is unable to complete its consideration of the matter within twelve months, it shall confine its report to a brief statement of the status of its consideration of the matter;

(b) If an amicable solution to the matter on the basis of respect for human rights as recognized in the present Covenant is reached, the Commission shall confine its report to a brief statement of the facts and of the solution reached;

14

(c) If a solution within the terms of sub-paragraph (b) is not reached, the Commission's report shall embody its findings on all questions of fact relevant to the issues between the States Parties concerned, and its views on the possibilities of an amicable solution of the matter. This report shall also contain the written submissions and a record of the oral submissions made by the States Parties concerned;

(d) If the Commission's report is submitted under sub-paragraph (c), the States Parties concerned shall, within three months of the receipt of the report, notify the Chairman of the Committee whether or not they accept the contents of the report of the Commission.

8. The provisions of this article are without prejudice to the responsibilities of the Committee under article 41.

9. The States Parties concerned shall share equally all the expenses of the members of the Commission in accordance with estimates to be provided by the Secretary-General of the United Nations.

10. The Secretary-General of the United Nations shall be empowered to pay the expenses of the members of the Commission, if necessary, before reimbursement by the States Parties concerned, in accordance with paragraph 9 of this article.

### Article 43

The members of the Committee, and of the *ad hoc* conciliation commissions which may be appointed under article 42, shall be entitled to the facilities, privileges and immunities of experts on mission for the United Nations as laid down in the relevant sections of the Convention on the Privileges and Immunities of the United Nations.

### Article 44

The provisions for the implementation of the present Covenant shall apply without prejudice to the procedures prescribed in the field of human rights by or under the constituent instruments and the conventions of the United Nations and of the specialized agencies and shall not prevent the States Parties to the present Covenant from having recourse to other procedures for settling a dispute in accordance with general or special international agreements in force between them.

### Article 45

The Committee shall submit to the General Assembly of the United Nations, through the Economic and Social Council, an annual report on its activities.

### PART V

### Article 46

Nothing in the present Covenant shall be interpreted as impairing the provisions of the Charter of the United Nations and of the constitutions of the specialized agencies which define the respective responsibilities of

the various organs of the United Nations and of the specialized agencies in regard to the matters dealt with in the present Covenant.

### Article 47

Nothing in the present Covenant shall be interpreted as impairing the inherent right of all peoples to enjoy and utilize fully and freely their natural wealth and resources.

### PART VI

### Article 48

1. The present Covenant is open for signature by any State Member of the United Nations or member of any of its specialized agencies, by any State Party to the Statute of the International Court of Justice, and by any other State which has been invited by the General Assembly of the United Nations to become a party to the present Covenant.

2. The present Covenant is subject to ratification. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3. The present Covenant shall be open to accession by any State referred to in paragraph 1 of this article.

4. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

5. The Secretary-General of the United Nations shall inform all States which have signed this Covenant or acceded to it of the deposit of each instrument of ratification or accession.

### Article 49

1. The present Covenant shall enter into force three months after the date of the deposit with the Secretary-General of the United Nations of the thirty-fifth instrument of ratification or instrument of accession.

2. For each State ratifying the present Covenant or acceding to it after the deposit of the thirty-fifth instrument of ratification or instrument of accession, the present Covenant shall enter into force three months after the date of the deposit of its own instrument of ratification or instrument of accession.

### Article 50

The provisions of the present Covenant shall extend to all parts of federal States without any limitations or exceptions.

### Article 51

1. Any State Party to the present Covenant may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General of the United Nations shall thereupon communicate any proposed amendments to the States Parties to the

15

present Covenant with a request that they notify him whether they favour a conference of States Parties for the purpose of considering and voting upon the proposals. In the event that at least one third of the States Parties favours such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of the States Parties present and voting at the conference shall be submitted to the General Assembly of the United Nations for approval.

2. Amendments shall come into force when they have been approved by the General Assembly of the United Nations and accepted by a two-thirds majority of the States Parties to the present Covenant in accordance with their respective constitutional processes.

3. When amendments come into force, they shall be binding on those States Parties which have accepted them, other States Parties still being bound by the provisions of the present Covenant and any earlier amendment which they have accepted.

### Article 52

Irrespective of the notifications made under article 48, paragraph 5, the Secretary-General of the United Nations shall inform all States referred to in paragraph 1 of the same article of the following particulars:

(a) Signatures, ratifications and accessions under article 48;

(b) The date of the entry into force of the present Covenant under article 49 and the date of the entry into force of any amendments under article 51.

### Article 53

1. The present Covenant, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit certified copies of the present Covenant to all States referred to in article 48.

# EXHIBIT "E"

**INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (Senate - April 02, 1992)**

[Page: S4781]

Mr. MITCHELL. Mr. President, I ask unanimous consent that the Senate proceed to executive session to consider Executive Calendar 17, the International Covenant on Civil and Political Rights.

I further ask unanimous consent that the treaty be considered as having passed through its various parliamentary stages up to and including the presentation of the resolution of ratification; that the recommended reservations, understandings, declaration and a proviso to Executive Calendar 17 be considered as having been proposed and agreed to and that no other amendments, reservations, understandings, declarations or provisos be in order; that any statements be inserted in the **Congressional Record** as if read; that the motion to reconsider be laid upon the table; that the President be notified of the Senate's action and that following disposition of the treaty.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. PELL. Mr. President, the International Covenant on Civil and Political Rights, which we are now considering, is part of the international community's early efforts to give the full force of international law to the principles of human rights embodied in the Universal Declaration of Human Rights and the U.N. Charter. The covenant is rooted in Western democratic traditions and values. It guarantees basic rights and freedoms consistent with our own Constitution and Bill of Rights.

The covenant was unanimously adopted by the U.N. General Assembly on December 16, 1966, and entered into force on March 23, 1976. To date, 103 States have become party to the covenant and another 5, including the United States, have signed.

The Carter administration submitted the covenant along with three other human rights treaties to the Senate in 1979. I believe that there was significant support for ratification at that time. However, domestic and international events at the end of 1979 prevented the Foreign Relations Committee from moving to a vote on the covenant after hearings were completed. The Reagan administration, regrettably, had no interest in ratifying this treaty. I am pleased that the present administration finally decided to support it last August. In my view, ratification is long overdue, but better late than never.

The Foreign Relations Committee held a hearing on the Covenant on November 21, 1991. At that time, the administration submitted a package of reservations, understandings and declarations for the committee's consideration. In many respects this package is similar to the one proposed by the Carter administration in 1979.

On March 4 the committee voted 19 to 0 to report favorably the covenant with a resolution of ratification containing the reservations, understandings, and declarations proposed by the Bush administration and a proviso offered by Senator Helms. This proviso is similar to language adopted by the Senate in October 1990 as part of the resolution of ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. If clarifies the relationship between the covenant and the U.S. Constitution. Since this relationship is a matter of U.S. domestic law, the proviso will not be included in the instrument of ratification to be deposited by the President.

The United States plays a leading role in the international struggle to promote and protect human rights. However, failure to ratify the covenant has blemished our record and cast doubt, in some quarters, about the seriousness of our commitment to human rights. Ratification will reverse this situation. It will demonstrate that our commitment is serious and sincere and strengthen our voice as a champion of human rights. Ratification will enable the United States to participate in the work of the Human Rights Committee established by the covenant to monitor compliance. The rights guaranteed by the covenant are the cornerstones of a democratic society. By ratifying the covenant now, we have an opportunity to promote democratic rights and freedoms and the rule of law in the former Soviet Republics, Eastern Europe, and other areas where democracy is taking hold.

During the course of the committee's consideration of the covenant, concerns were expressed by some in the human rights and legal communities about particular conditions proposed by the administration for ratification. I some cases, U.S. law and practice was at issue. In others, it was a philosophical difference. However, in the final analysis, the vast majority of those expressing concern came down in favor of ratification with the administration's proposed package. It is clear that there is widespread support for U.S. ratification of this covenant now among those in the human rights field. Mr. President, I ask unanimous consent that the following letters of support be printed in the Record.

Mr. President, this is a worthy covenant and one that we can be proud of ratifying. I urge all my colleagues to support it.

There being no objection, the letters were ordered to be printed in the **Record**, as follows:

Amnesty International USA,
*Washington, DC, March 27, 1992.*

Hon. Claiborne Pell,
*Chairman, Senate Foreign Relations Committee,*
*U.S. Senate, Washington, DC.*

**Dear Senator Pell:** As you know, Amnesty International supports ratification by the United States of the International Covenant on Civil and Political Rights (ICCPR). We regard ratification of this instrument as a major first step in the process of the United States entering more fully into an international human rights system, which is of the greatest importance for the promotion of human rights around the world. We also consider that ratification should proceed as expeditiously as possible. For too long the influence and moral authority of the United States in the international promotion and protection of human rights has been seriously undermined by its failure to ratify some of the fundamental human rights instruments including the two International Covenants. We have welcomed your leadership on the issue of ratification of the ICCPR and the efforts you have made to carry forward this process in the Senate.

As you also well know, however, Amnesty International has consistently maintained its position that it is of the utmost importance that the United States ratify such international human rights treaties without reservations, declarations or understandings that undermine the guarantees of the ICCPR. We are, therefore, most concerned about the limiting reservations, declarations and understandings put forward



by the Administration which we consider reflect an unwillingness by the United States to accept the full scope of the international standards set forth in the ICCPR.

In particular, Amnesty International has serious objections to the reservation proposed in respect to Article 6 of the ICCPR--a reservation that envisages the continued practice within the United States of the execution of juvenile offenders. Article 6 guarantees one of the most fundamental rights protected by the ICCPR--the right to life--and its provisions are among those which may never be derogated from in any circumstances, according to Article 4(2). Indeed, there is a serious question as to whether a reservation to a non-derogable right would be considered null and void. The international consensus against the execution of juvenile offenders, which is also reflected in a number of other important international human rights standards, is overwhelming. Only a very few governments continue to execute juvenile offenders--besides the United States these include Bangladesh, Iran, Iraq, Nigeria and Pakistan.

If this reservation is maintained, Amnesty International will continue to make every effort to draw attention to this grave limitation by the United States on the fundamental rights guaranteed by the ICCPR following ratification. We will actively seek through our membership in this country and internationally, to bring the United States fully into conformity with all the standards in the ICCPR. This would include approaches by our organization to urge other states parties to the ICCPR as well as its monitoring body, the Human Rights Committee, to take up directly with the United States Government the issue of the execution of juvenile offenders and the validity of a reservation to a nonderogable right.

We hope you will be able to take these concerns into account and we look forward to continuing to work with you in ensuring full compliance by the United States with international human rights standards.

Sincerely yours,

Carole Nagengast,
Chair, Board of Directors.

--

UNITED NATIONS ASSOCIATION OF THE UNITED STATES OF AMERICA,
New York, NY, March 31, 1992.

Senator Claiborne Pell,
Committee on Foreign Relations,
Washington, DC.

[Page: S4782]

**Dear Mr. Chairman:** The United Nations Association of the United States welcomes the recent decision of the Foreign Relations Committee to support by unanimous vote a resolution of ratification for the International Covenant on Civil and Political Rights (ICCPR). We now urge you to join with your colleagues in seeking an expeditious vote on advice and consent to ratification of this important human rights document.

The Covenant, which obligates governments to protect civil and political freedoms contained in the Universal Declaration of Human Rights, is increasingly important to the process of democratization that is underway in so many areas of the world. Ratification of this treaty will strengthen the United States' credibility as a proponent of human rights while augmenting the ICCPR as the single standard for all nations in the field of civil and political rights. Our country's adherence to the Covenant will also enhance America's ability to influence the interpretation, application, and further development of international human rights law in a way that promotes universal respect for democratic principles and the rule of law.

The United States played an important role in drafting the Covenant, voted for its adoption in 1966, and President Carter signed it in 1977. Today, 102 states--including most of Western Europe--are parties to it. Like President Bush, we believe that US ratification of the Covenant will enhance our nation's efforts to improve respect for fundamental freedoms around the world. At its National Convention in 1990, UNA-USA adopted a resolution on ratification of international human rights treaties, noting, `in this new worldwide era of democracy, of international cooperation and of support for the United Nations, the promotion and protection of human rights deserve special priority on behalf of all nations.' We urge you to support actively continuing US leadership in this field.

With best wishes,

Sincerely,

JOHN C. WHITEHEAD,

Chair of the Association.

MAX. M. KAMPELMAN,

Chair, Board of Governors.

--

--

Yale Law School,
New Haven, CT, March 20, 1992.

Senator Claiborne Pell,
Chairman, Senate Foreign Relations Committee, U.S. Senate, Washington, DC.

Case 1:09-cv-21504-MGC   Document 1   Entered on FLSD Docket 06/04/2009   Page 49 of 86

**Dear Senator Pell:** We write to urge the Senate to advise and consent to the International Covenant on Civil and Political Rights so that the United States may promptly ratify it.

We are disappointed on some of the reservations, declarations and understandings that are proposed. 1

We believe they are unnecessary to protect genuine national interests and unhelpful to achievement of the objectives of the Covenant. United States' ratification even on those terms, however, is preferable to no ratification. The national momentum for ratifying human rights instruments, arrested some forty years ago but now reestablished, should not be stopped. Ratification of this and other instruments will enhance the cause of human rights, an important part of our foreign policy, and enable our government and citizens to play a more direct and active role in their implementation. Failure to advise and consent and to ratify will limit our role. The message we seek to send to governments and peoples everywhere will be greatly confused.

1 You may, of course, advise and consent while expressing your hesitations about all or some of the reservations, declarations and understandings. We would be prepared to offer you our own advice about what we think these failings are.

World order has taken enormous strides in recognizing and demanding human rights. In commencing to ratify human rights treaties, we have resumed an important and indispensable role in international organizational implementation.

We hope you and your colleagues in the Senate will now advise and consent to the International Covenant on Civil and Political Rights.

Sincerely,

Ralph Brown, S.E. Baldwin Professor of Law, Emeritus; W. Michael Reisman, W.N. Hohfeld Professor of Jurisprudence; Harold H. Koh, Professor of Law; Ruth Wedgwood, Associate Professor of Law; Myres S. McDougal, Sterling Professor of Law, Emeritus.

--

--

UNIVERSITY OF FLORIDA,

College of Law,
*Gainesville, FL, March 27, 1992.*

Senator Claiborne Pell,
*Chairman, Senate Foreign Relations Committee, U.S. Senate, Washington, DC.*

**Dear Senator Pell:** Attached you will find the copy of a letter signed by members of the faculty of the University of Florida College of Law. In this letter we urge that you support bringing the international covenant on Civil and Political Rights to the floor of the senate for an affirmative advice and consent vote as soon as possible.

Yours sincerely,

Winston P. Nagan,
*Professor of Law.*

--

University of Florida,
*Gainesville, FL, March 26, 1992.*

Senator Claiborne Pell,
*Chairman, Senate Foreign Relations Committee, U.S. Senate, Washington, DC.*

**Dear Senator Pell:** We write to commend your leadership and the Senate Foreign Relations Committee's good sense in voting out (by a vote of 19-0) the International Covenant on Civil and Political Rights. We now urge that you and your colleagues in the Senate act to promptly give the advice and consent of the Senate to the Covenant to ensure its prompt ratification by the United States.

As academic lawyers deeply concerned about the Rule of Law and the defense of democratic institutions, we are disappointed at some of the reservations, declarations and understanding [RUD's] that the Foreign Relations Committee has proposed. We do not believe that these qualifications on the Covenant are necessarily in the national interest, nor do we believe they will accelerate the achievement of the major purposes of the Convention. However, we strongly believe that it is in the national interest to secure ratification, even with the package of RUD's, rather than risk the prospect of no ratification.

The promise of the Rule of Law and a global initiative in favor of democracy was radically, and astigmatically limited forty years ago when the ratification log-jam started. The political will and the international climate now indicate a renewed commitment to the Covenants is warranted, and in the national interest. This process should not be arrested.

Ratification of the International Covenant on Civil and Political Rights will significantly enhance respect for human rights and fundamental freedoms around the world and is an important institutional support for the development of the civil society in vast corners of the globe where U.S. influence is paramount. The instrument when ratified will become an important part of our foreign policy calculus, and enable our government and citizens to play a direct and active role in the implementation of the prescriptions in the Covenant.

A failure to promptly give the Senate's advice and consent to ensure ratification will severely limit the efficacy of the U.S. role in world affairs and will send a confusing signal about the true genesis of American commitment to the Rule of Law and democratic values.

We strongly urge that you do all in your power to secure the ratification of the International Covenant of Civil and Political Rights.

Yours sincerely,

Winston P. Nagan, Professor of Law; Fletcher N. Baldwin, Jr., Professor of Law; Kermit L. Hall, Professor of Law; Stuart R. Cohn, Professor of Law; George K. Yin, Professor of Law; E.L. Roy Hunt, Professor of Law; Ernest M. Jones, Professor of Law; Thomas R. Hurst, Professor of Law; Joseph W. Little, Professor of Law; Walter Probert, Professor of Law; Michael W. Gordon, Professor of Law; Christopher Slobogin, Professor of Law; Jeffrey Davis, Professor of Law; Jon Mills, Professor of Law.

Amy R. Mashburn, Assistant Professor of Law; Steven J. Willis, Professor of Law; Walter O. Weyrauch, Professor of Law; Alyson Flournoy, Professor of Law; Jeffrey L. Harrison, Professor of Law; Elizabeth T. Lear, Assistant Professor of Law; Michael L. Seigel, Assistant Professor of Law; Richard N. Pearson, Professor of Law; Julian C. Juergensmeyer, Professor of Law; Juan F. Perea, Assistant Professor of Law; George L. Dawson, Professor of Law; Anne L. Spitzer, Professor of Law; Don Peters, Professor of Law; David M. Richardson, Professor of Law.

Mr. GORE. Mr. President, I ask unanimous consent to have printed in the **Record** a letter from the American Association for the Advancement of Science endorsing the International Covenant on Civil and Political Rights.

There being no objection, the letter was ordered to be printed in the **Record**, as follows:
AMERICAN ASSOCIATION FOR THE

Advancement of Science,
*Washington, DC, April 1, 1992.*

Hon. Al Gore,
*Russell Senate Office Building,*
*Washington, DC.*

**Dear Senator Gore:** The American Association for the Advancement of Science, the largest federation of scientific societies in the United States and the publisher of Science magazine, is on record in support of U.S. ratification of the International Covenant on Civil and Political Rights (ICCPR) and requests that the Senate give its advice and consent on the Covenant. Our recommendation is based on three considerations: (1) Many of the rights set out in the ICCPR are vital to maintain scientific and academic freedom. The ICCPR protects such rights central to the conduct of science as the right to liberty and security of person, freedom of thought, conscience, and religion; freedom from arbitrary deprivation of life; freedom of movement and choice of residence; and freedom of association. (2) Scientists in many countries experience violations of their human rights. In 1992, the American Association for the Advancement of Science documented violations ranging from the government revocation of academic degrees, demotions or dismissals, to arrests and arbitrary detentions, ` disappearances,' and extrajudicial killings of 109 foreign scientists, engineers, and health care professionals. (3) Support would constitute a humanitarian gesture and a commitment to the advancement of humankind. Infringements of human rights not only hinder the pursuit of scientific inquiry, but also adversely affect the progress and potential of human society. We believe that ratification of the ICCPR would greatly enhance the international legal framework that is intended to protect the human rights of all peoples, including scientists.

Sincerely,
*Richard S. Nicholson.*

[Page: S4783]

## COVENANT ON CIVIL AND POLITICAL RIGHTS

Mr. MOYNIHAN. Mr. President, I am pleased that the Senate is moving to give its advice and consent to the ratification of the Covenant on Civil and Political Rights. This covenant reflects the principles articulated in our own Bill of Rights. U.S. ratification will both strengthen the cause of international human rights and improve the ability of the United States to play a strong and constructive role in enforcing these standards.

Some have raised concerns about the standards in the covenant having to do with free speech. I strongly support the administration's reservation on this provision and believe that by ratifying the covenant the United States will be in a position to help prevent misinterpretation and abuse of this provision.

Others have raised the legitimate concern that the number of reservations in the administration's package might imply to some that the United States does not take the obligations of the covenant seriously. It should be noted, however, that the United States has accepted the overwhelming majority of the obligations of the covenant without reservation. Even though the covenant is non-self-executing, these will now become binding international obligations of the United States.

Moreover, it is possible to place a wholly different interpretation on the administration's package of reservations. The administration has not taken a blanket, or catchall reservation. It has not said that our domestic practices, wherever they differ from the covenant, are always superior. Rather, it has undertaken a meticulous examination of U.S. practice to insure that the United States will in fact comply with the obligations that it is assuming. This can certainly be viewed as an indication of the seriousness with which the obligations are regarded rather than as an expression of disdain for the obligations. Certainly, there was a time when the nations of the totalitarian block ratified obligations without reservation--obligations that they had no intention of carrying out. Far better to ratify with the firm intention of living up to the covenant's terms.

Finally--and importantly--let none assume that a vote for the covenant is equivalent to acquiescence in any particular domestic practice. It should be clear that a vote in favor of giving the Senate's consent to ratification does not imply approval of each and every reservation, understanding and declaration in the administration's package. Some parts of the package deserve strong support, as in the case of the reservation on speech, which I have already mentioned, and U.S. acceptance of the jurisdiction of the Human Rights Committee under article 41. But a Senator might well conclude that it is in the interests of the United States to ratify the covenant with this package of reservations even if that Senator disagrees strongly with a particular domestic practice which has prompted a reservation. Some of those practices are most controversial and I know that many Senators who will vote to give consent to ratification will nonetheless continue their efforts to change these domestic practices in the committees of jurisdiction in the Senate. The two are not inconsistent in the least.

To say again, Mr. President, I believe that the decision of the President to request the Senate's consent to ratification is an important step--one which builds upon the Senate's consideration of the Genocide Convention, the Torture Convention and the International Labor Organization Convention on Forced Labor. I am pleased that the United States is moving to support these important human rights standards.

Mr. MITCHELL. Mr. President, I ask for a division vote.

The PRESIDING OFFICER. A division vote is requested. Senators in favor of the resolution of ratification will rise and stand until counted. (After a pause.) Those opposed will rise and stand until counted.

In the opinion of the Chair, two-thirds of the Senators as present has voted in the affirmative, the resolution of ratification is agreed to.

The resolution of ratification is as follows:

Resolved (two-thirds of the Senators present concurring therein), That the Senate advise and consent to the ratification of the International Covenant on Civil and Political Rights, adopted by the United Nations General Assembly on December 16, 1966, and signed on behalf of the United States on October 5, 1977 (Executive E, 95-2), subject to the following Reservations, Understandings, Declarations and Proviso:

I. The Senate's advice and consent is subject to the following reservations:

(1) That Article 20 does not authorize or require legislation or other action by the United States that would restrict the right of free speech and association protected by the Constitution and laws of the United States.

(2) That the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

(3) That the United States considers itself bound by Article 7 to the extent that `cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States.

(4) That because U.S. law generally applies to an offender the penalty in force at the time the offense was committed, the United States does not adhere to the third clause of paragraph 1 of Article 15.

(5) That the policy and practice of the United States are generally in compliance with and supportive of the Covenant's provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 Article 10 and paragraph 4 of Article 14. The United States further reserves to these provisions with respect to individuals who volunteer for military service prior to age 18.

II. The Senate's advice and consent is subject to the following understandings, which shall apply to the obligations of the United States under this Covenant:

(1) That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin,
property, birth or any other status--as those terms are used in Article 2, paragraph 1 and Article 26--to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in paragraph 1 of Article 4 upon discrimination, in time of public emergency, based `solely' on the status of race, color, sex, language, religion or social origin not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

(2) That the United States understands the right to compensation referred to in Articles 9(5) and 14(6) to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

(3) That the United States understands the reference to `exceptional circumstances' in paragraph 2(a) of Article 10 to permit the imprisonment of an accused person with convicted persons where appropriate in light of an individual's overall dangerousness, and to permit accused persons to waive their right to segregation from convicted persons. The United States further understands that paragraph 3 of Article 10 does not diminish the goals of punishment, deterrence, and incapacitation as additional legitimate purposes for a penitentiary system.

(4) That the United States understands that subparagraphs 3(b) and (d) of Article 14 do not require the provision of a criminal defendant's counsel of choice when the defendant is provided with court-appointed counsel on grounds of indigence, when the defendant is financially able to retain alternative counsel, or when imprisonment is not imposed. The United States further understands that paragraph 3(e) does not prohibit a requirement that the defendant make a showing that any witness whose attendance he seeks to compel is necessary for his defense. The United States understands the prohibition upon double jeopardy in paragraph 7 to apply only when the judgment of acquittal has been rendered by a court of the same governmental unit, whether the Federal Government or a constituent unit, as is seeking a new trial for the same cause.

(5) That the United States understands that this Covenant shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriate measures for the fulfillment of the Covenant.

III. The Senate's advice and consent is subject to the following declarations:

(1) That the United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing.

(2) That it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant. For the United States, Article 5, paragraph 2, which provides that fundamental human rights existing in any State Party may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to Article 19, paragraph 3, which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect to all such restrictions and limitations.

(3) That the United States declares that it accepts the competence of the Human Rights Committee to receive and consider communications under Article 41 in which a State Party claims that another State Party is not fulfilling its obligations under the Covenant

(4) That the United States declares that the right referred to in Article 47 may be exercised only in accordance with international law.

IV. The Senate's advice and consent is subject to the following proviso, which shall not be included in the instrument of ratification to be deposited by the President:

Nothing in this Covenant requires or authorizes legislation, or other action, by the United States of America prohibited by the Constitution of the United States as interpreted by the United States.

[Page: S4784]

Mr. MITCHELL. Mr. President, I move to reconsider the vote by which the resolution of ratification was agreed to.

Mr. STEVENS. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

*END*

# EXHIBIT "F"

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                     MIAMI DIVISION
 3          CASE NO. 08-MC-22414-UNA/O'SULLIVAN


 4    _____|        MIAMI, FLORIDA
      UNITED STATES OF AMERICA,   |
 5                                 |
                     Plaintiff,    |        MAY 5, 2009
 6                                 |
      vs.                          |
 7                                 |
      TELMO RICARDO HURTADO,       |
 8                                 |
                     Defendant.    |
 9    _____x
10
                    TRANSCRIPT OF EXTRADITION HEARING
11           BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
                  UNITED STATES MAGISTRATE JUDGE
12    APPEARANCES:
13    FOR THE GOVERNMENT:       WILLIAM C. WHITE, ESQ.
                                Assistant U.S. Attorney
14                              99 Northeast 4th Street
                                Miami, FL 33132      305.961.9451
15
16    FOR THE DEFENDANT:        SABRINA D. VORA-PUGLISI, ESQ.
                                Assistant Federal Defender
17                              150 West Flagler Street
                                Miami, FL 33130      305.530.7000
18
      REPORTED BY:              LARRY HERR, RPR-RMR-FCRR-AE
19                              Official United States Court Reporter
                                Federally Certified Realtime Reporter
20                              400 North Miami Avenue, Room 8N09
                                Miami, FL  33128      305.523.5290
21
22
23
24
25
```

DEFENDANT'S
EXHIBIT
E

1                        TABLE OF CONTENTS

2
                                                         Page

3
    Reporter's Certificate ................................. 27

4
                            CITATIONS

5
                                                         Page

6   Fernandez in the United States Supreme Court, 268

    U.S. at 312 .............................................. 3

7

    Galina vs. Fraser, F-r-a-s-e-r, 278 F.2d 77 ............... 19

8

    In the Matter of Extradition of John Edward Berks ......... 21

9

    Poxa vs. Levy, 465 F.3d 554 ................................ 3

10

    United States vs. Fernandez vs. Morris .................... 19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We are here today in the case of or In the

2   Matter of the Extradition of Telmo Ricardo Hurtado-Hurtado,

3   Case No. 08-MC-22414.

4          Could I appearances, for the Government first?

5          MR. WHITE:  Good afternoon, Your Honor.  William White

6   for the United States accompanied by Special Agent Victor

7   Williams.

8          THE COURT:  Okay.  And who is Victor Williams with?

9          MR. WHITE:  ICE, Your Honor.

10          THE COURT:  Okay.  And for Mr. Hurtado?

11          MS. PUGLISI:  Good afternoon.  Sabrina Puglisi,

12   Assistant Federal Defender, on behalf of Mr. Hurtado, who is

13   present and using the aid of a Spanish interpreter.

14          THE COURT:  Thank you.  You can be seated.

15          We're here today for an extradition hearing.  The

16   Government filed a brief back at the beginning of this case in

17   September called the United States Memorandum of Law in support

18   of their request for certification in which they lay out five

19   elements that the 3rd Circuit -- I'm sorry, that Fernandez in

20   the United States Supreme Court, 268 U.S. at 312, as well as

21   the 3rd Circuit, Poxa vs. Levy, 465 F.3d 554, cite to what is

22   required in order for the Court to issue an extradition

23   certification.

24          What I wanted to inquire with Mr. Hurtado's counsel is

25   whether or not you stipulate or require the Government to prove

1  each of these elements.  I'll go through them and you let me

2  know, Ms. Puglisi, if you want to stipulate or you are

3  contesting the Government's proof on a particular element.

4          MS. PUGLISI:  Yes, Your Honor.

5          THE COURT:  The first one is the judicial officer,

6  that would be me, is authorized to conduct an extradition

7  proceeding.  Do you stipulate to that?

8          MS. PUGLISI:  We do, Judge.

9          THE COURT:  The second one that the Court has

10  jurisdiction over the fugitive, that would be Mr. Hurtado.

11          MS. PUGLISI:  We stipulate to that.

12          THE COURT:  That the applicable treaty is in full

13  force and effect, that's the treaty that's been referred to

14  throughout these proceedings?

15          MS. PUGLISI:  We do stipulate to that.

16          THE COURT:  The fourth one is that the crime or crimes

17  for which surrender is requested are covered by the applicable

18  treaty.

19          MS. PUGLISI:  We would contest that issue.

20          THE COURT:  And that the fifth one, the final one, is

21  that there's sufficient evidence to support a finding of

22  probable cause as to each charge for which extradition is

23  sought?

24          MS. PUGLISI:  We contest that issue in part as to only

25  a few of the charges.

1          THE COURT:  Then let me hear from the Government on

2   how you would like to proceed today.

3          MR. WHITE:  Thank you, Your Honor.

4          Just so the record is clear, in the event there is a

5   petition for a writ of habeas corpus and an appeal from that,

6   I'd like to go over all of the elements briefly even though

7   they were stipulated to.

8          THE COURT:  Okay.

9          MR. WHITE:  First, Your Honor, I would like to

10  introduce for purposes of this hearing exhibits which are the

11  same exhibits that we have filed with the Court.  I would ask

12  the Court to take judicial notice of its own records which

13  include the complaint in extradition and all these exhibits

14  except for two.  The other two exhibits relate to the identity

15  issue which has been stipulated to.

16         So I would at this time offer Mr. Hurtado's passport

17  and a visa application, which these documents, as Exhibits 8

18  and 9, I have given Ms. Puglisi a copy, and these documents

19  will show that the cedula number, the date of birth, the place

20  of birth, and the picture of Mr. Hurtado match that of the

21  extradition warrant; therefore, we have the right person before

22  the Court.

23         THE COURT:  We'll admit those as Exhibits 8 and 9.

24         If I understand you correctly, Exhibits 1 through 7

25  are already within the court file?

1          MR. WHITE:  They are, Your Honor, the originals with

2    ribbons and seals and that sort of thing that Ms. Puglisi and I

3    reviewed early on in the case in your chambers.  I just have

4    these here for the convenience of the parties.

5          THE COURT:  Okay.  So those Exhibits 1 through 7 I'll

6    allow the Government to maintain custody of because you already

7    have duplicates of those in the official record.

8          Exhibits 8 and 9, if you could hand those to the clerk

9    of the court so she can make them part of the record.

10          MR. WHITE:  Your Honor, just so there's a reference,

11    as I say, in further proceedings.  As to the first point

12    because, obviously, has been challenged in the case law, so I

13    just want to go over them.

14          The authority to conduct an extradition proceeding by

15    this Court is found in 8 USC, Section 3184, and more

16    importantly, in Local Magistrate Rule of the Southern District

17    of Florida, Local Magistrate Rule 3.  The jurisdiction over the

18    person sought to be extradited, I have just gone over his

19    identity, and it has been established.

20          The treaty, the applicable treaty is in full force and

21    effect.  This is shown both by 18 USC, 3181 and the declaration

22    of Heather K. McShain, M-c-S-h-a-i-n, found on the second page

23    of Exhibit 7.

24          As far as dual criminality --

25          THE COURT:  When you say the second page of Exhibit 7,

1   what is Exhibit 7?  Where would we find that on the docket?  Do

2   you know?

3          MR. WHITE:  That's GX 2.  If I can hand this up, Your

4   Honor.  It's right at the front of the exhibit.

5          THE COURT:  This is GX 2 in the docket?

6          MR. WHITE:  Correct, Your Honor.  That is GX 2 in our

7   original filing.  It's the same volume number, but I put an

8   exhibit sticker on it for purposes of this hearing.

9          THE COURT:  Well, why don't we, instead of using these

10  new exhibit stickers, actually refer to these under their

11  originals because we're going to rely on what's in the docket.

12         MR. WHITE:  Thank you, Your Honor.

13         THE COURT:  So this GX 2 is in the copy of this that

14  appears in the docket?

15         MR. WHITE:  Yes, Your Honor.

16         THE COURT:  Okay.  So we'll call that GX 2.

17         And it's on the cover here?

18         MR. WHITE:  It's right at the beginning.

19         THE COURT:  I have it.

20         MR. WHITE:  As far as dual criminality, the crimes for

21  which surrender is requested are covered by this treaty, and

22  that's shown by referring to the first volume that we have

23  introduced.

24         THE COURT:  Which is what?  Show me that.  GX what?

25         MR. WHITE:  That would be GX-3.  It's noted as Volume

```
 1   1 as well.  Beginning at page 37.

 2              THE COURT:  All right.

 3              MR. WHITE:  Murder is a violation of Section 152 of

 4   the Peruvian Criminal Code of 1924, which was in effect at the

 5   time of these crimes.  Equivalent United States laws are

 6   Florida Statute 782.04, murder; and in the federal realm, 18

 7   United States Code, Section 1111, also dealing with murder.

 8              Abduction is a crime punishable pursuant to Section

 9   223 of the Peruvian Criminal Code of 1924.  And forced

10   abduction is a violation of Section 320 of the Peruvian

11   Criminal Code of 1993.  Equivalent United States laws are

12   Florida Statute 787.01, kidnapping, at 18 United States Code,

13   Section 1201 again, kidnapping.

14              I know that the question arises in everyone's mind

15   about the Peruvian Criminal Code of 1993 since these acts

16   occurred before that.  It is the position of Peru and the

17   position of the United States Government that since this is a

18   continuing crime as to the abduction of the guide, his body has

19   never been found, and so we don't know if it's murder, but we

20   know it was forced abduction at the time.  That's the basis of

21   the request from Peru.

22              Finally, in probable cause, there is sufficient

23   evidence to support a finding of probable cause that Hurtado

24   committed each offense.

25              THE COURT:  What about the third charge, forced
```

1  disappearance?

2          MR. WHITE:  Well, forced disappearance, Your Honor, we

3  say is equivalent again to kidnapping.

4          THE COURT:  You said it was equivalent to murder.

5          MR. WHITE:  Well, I did.  I said it was equivalent to

6  both.  If you look at the top of that page in my brief, it says

7  kidnapping, and then as I go down I say murder, because it

8  seems to me the facts support that Hurtado shot the guide.  The

9  guide fell into a gully and was never seen again.  I certainly

10 would charge murder as a prosecutor.

11         But as I say, the equivalent crime as it stands with

12 Peru is either kidnapping or murder.  And as the Court knows,

13 it does not have to be the exact equivalent of the foreign

14 crime.

15         Your Honor, finally as to probable cause.  There is

16 sufficient evidence to support a finding of probable cause that

17 each offense was committed.

18         Throughout the formal request for extradition

19 beginning in relevant part on page 12 --

20         THE COURT:  Page 12 of what?

21         MR. WHITE:  Page 12 of GX-3.  Most of the things that

22 Ms. Puglisi and I will be referring to are in Volume 1 or GX 3,

23 Your Honor.

24         THE COURT:  Okay.

25         MR. WHITE:  Beginning in relevant part on page 12:

1    Hurtado's actions are discussed again and again.  The

2    conclusion of the Supreme Court of Justice, Criminal Division,

3    regarding the murder of 69 human beings is found beginning on

4    page 238 of that exhibit, listing the names of the 62 villagers

5    murdered on August 14, 1985.

6            THE COURT:  Can I interrupt you?  Can you hand me up

7    that volume that you're referring to, please?

8            Page 238, you said?

9            MR. WHITE:  238, Your Honor.

10           THE COURT:  Okay.  Page 239 is where they --

11           MR. WHITE:  Beginning on -- that's the discussion.

12   Beginning in that area they list actually the names of the 62

13   villagers.

14           THE COURT:  I got it.

15           MR. WHITE:  As the record shows, Mr. Hurtado admitted

16   to 25 deaths.  The military communicat of Lima, Peru, listed

17   40.  But the later investigation revealed 62 with names at that

18   time.  This was the August 14, 1985 patrol.

19           Now, Mr. Hurtado's actions on September 13, 1985 in

20   murdering six additional human beings who were probable

21   witnesses to the August 14th killings is found on page -- I'm

22   sorry, that would be seven -- found on page 81 of that exhibit.

23           This is the culmination of the investigation by the

24   Commission and various military tribunals and so forth that

25   finally was incorporated in the Supreme Court's decision and

1   warrant.

2           THE COURT:  I'm sorry.  Give me the page number again

3   with the seven folks.

4           MR. WHITE:  81.  And Mr. Hurtado admits his actions in

5   a statement beginning on page 324 of that exhibit, although as

6   I stated, it does not accurately acknowledge the number of

7   victims.

8           Finally, the forced abduction of the guide is

9   described on page 22 of that exhibit.

10          THE COURT:  The guide, is that separate from --

11          MR. WHITE:  That's the forced abduction.

12          THE COURT:  What page is that?

13          MR. WHITE:  That's page 22.

14          With counsel's permission, I will just mark this

15  summary of argument as an exhibit and leave it with the Court.

16          MS. PUGLISI:  No objection, Judge.

17          THE COURT:  Okay.  Let's just go back to a little

18  housekeeping here.  What are the numbers on the old GX numbers

19  on these files here?  I have GX 3.  I actually have GX 3 and GX

20  2.  Can you read the other GX numbers that are on the files

21  here that you're relying on today?

22          MR. WHITE:  I can, Your Honor.  What is Volume 2 is GX

23  4.  Volume 3 is GX 5.  Volume 4 is GX 6.  Volume 5 is GX 7.

24  The diplomatic note, GX 1.  I think you have the other.

25          THE COURT:  GX 2 is --

1            MR. WHITE:   Is another diplomatic note, I believe.

2            THE COURT:   Right.   The letter that's signed by

3   Heather McShain on December 7, 2007, with attachments.   And GX

4   3 is Volume 1, translation of pages 1 through 483 corresponding

5   to pages 0 to 183 of the original.

6            So we're going to refer to these -- rather than the

7   yellow stickers that are on there, we're going to use the

8   original numbers so that it's less confusing.

9            MR. WHITE:   Yes, Your Honor.

10            THE COURT:   We have the seven there, right, and then

11   we used 8 and 9 for the two identity documents?

12            MR. WHITE:   Yes, Your Honor.

13            THE COURT:   So we'll make your summary 10.

14            MR. WHITE:   Yes.

15            THE COURT:   So the summary will be marked Government's

16   Exhibit 10, GX-10.

17            Well, 8, 9 and 10 are new exhibits.   No. 20 is

18   Government's summary, you can call it.

19            MR. WHITE:   Your Honor, that completes my summary.

20            If there are no questions, I will yield to counsel.

21            THE COURT:   Okay.   Let's hear what Mr. Hurtado says

22   and then I may have some questions for you.

23            MS. PUGLISI:   The first argument, Judge, I'll address

24   the probable cause with respect to seven of the alleged murder

25   victims.   This is specifically with respect to the date of

13

1  September 13th, 1985.  The facts surrounding this are that

2  Mr. Hurtado with others went back to the area to get rid of any

3  additional witnesses that might be present.  Where I think

4  probable cause is lacking in this portion.

5          THE COURT:  Is the charge on this murder or abduction

6  or both?

7          MS. PUGLISI:  It's murder, Judge.

8          THE COURT:  Murder?

9          MS. PUGLISI:  Yes.  If I can refer to Volume 1 --

10          THE COURT:  Volume 1 is GX 3.  I have it up here.

11          MS. PUGLISI:  Right.  So, Judge, if you refer to GX 3,

12  pages 100 to 102, specifically going to page -- that kind of

13  section -- but if you specifically look to page 101 it, starts

14  Section B, and it talks about the defendant, Telmo Ricardo

15  Hurtado-Hurtado, is accused of the alleged perpetration.  This

16  is of the other seven individuals.  And what it does is it

17  speaks to the alleged actions that took place, and it says at

18  the end his criminal behavior was observed by Floriano De La

19  Cruz.

20          Judge, I was unable to find any witness statement in

21  all of the evidence that was presented by the Government of a

22  specific witness with this name.

23          THE COURT:  Okay.

24          MS. PUGLISI:  What I see here is just a summary or a

25  description of it, but I don't believe that that's sufficient

1    to find probable cause.  Whereas, if you look to the other 62

2    victims, Mr. Hurtado have witness statements that he actually

3    admitted to that, not to that exact number, but you also can go

4    to other portions of the record where they exhumed bodies and

5    they have specifically the names of each person and they were

6    able to identify each of those people, and they had more than

7    one witness as well as Mr. Hurtado's statements.

8           So I believe, Judge, with respect to just these seven

9    individuals, there is insufficient evidence for the Government

10   to have met probable cause.

11          Now, the next argument would be with respect to dual

12   criminality, specifically with respect to the guide, the forced

13   disappearance/abduction of the guide.  And I'm specifically

14   talking about the charge of forced disappearance.  Now, there's

15   no argument that there is no actual charge or crime in the

16   United States of forced disappearance.  The Government spoke to

17   the fact that it could have been murder.  However, if that was

18   what Peru wanted to charge him with, they could have charged

19   him with murder, as we already know they did in these other

20   individuals.

21          So the other thing I think is important to look to,

22   Judge, and I'll refer to GX-3.  This is going to be pages 569

23   and 570.

24          THE COURT:  569?

25          MS. PUGLISI:  Yes.  Is that in Volume 1?  That might

1    not be in --

2          THE COURT:  No.  You are referring to GX 4.

3          MS. PUGLISI:  I'm sorry.  I didn't write down which

4    volume that was.

5          THE COURT:  It will probably be GX 4, because GX 3

6    goes to page 470 or 480-something.

7          So you're referring to GX 4, correct?

8          MS. PUGLISI:  Yes, GX 4, pages 569 and 570.

9          THE COURT:  Yes.

10          MS. PUGLISI:  If you look to paragraph 115, going down

11   to the end, it says, for example, during the investigation he

12   maintained, and this is referring to a statement given by

13   Mr. Hurtado, he mentioned that he shot the aforementioned

14   person, and they're specifically discussing the guide,

15   Philomeno Chacon Ticse, T-i-c-s-e, when he attempted to flee.

16          And if you look at the last portion of that paragraph,

17   a statement specifically from Mr. Hurtado was he was shot

18   because he refused to stop, but I cannot be sure if he was

19   injured or not because he jumped into a gully never to be seen

20   again.

21          I think by these facts that this individual, it was a

22   direct order by an officer and he disregarded it.  He was shot.

23   There is no facts that we know of that he was murdered.  He

24   jumped into the gully.  We don't know what happened to him.  I

25   don't think that there is sufficient crime in the United States

1    that would be comparable to this charge of forced

2    disappearance.

3              THE COURT:  Okay.

4              MS. PUGLISI:  Now, Judge, with respect to all of the

5    charges --

6              THE COURT:  Let me just interrupt so I understand.

7    The abduction and the forced disappearance counts, that's only

8    on this guide?

9              MS. PUGLISI:  Yes.

10             THE COURT:  Go ahead.  And everybody else is a murder

11   count, correct?

12             MS. PUGLISI:  Correct.

13             THE COURT:  Okay.

14             MS. PUGLISI:  With respect to all of the charges,

15   Judge, we believe that the Government is unable to satisfy the

16   dual criminality argument by the simple fact that there is no

17   question that Mr. Hurtado was in the military at this time.

18   This was a war zone.  It was a war against the Shining Path, a

19   gorilla organization, a terrorist organization.  He was ordered

20   by superiors to go to this area, and he was actually told the

21   objective of military operations was to capture and/or destroy

22   the existing terrorist elements in Accomarca.  And I'm

23   referring to GS 4, page 556.

24             Judge, during this time we know that he was doing his

25   duty, not whether he went beyond that duty or not.  The charge

1   or the facts underlying it have to do with murder while in the
2   line of duty.  And there is no comparable charge here in
3   Federal Court in the United States other than a military court
4   that has to do with murder while in the line of duty.

5        Now, we see all the time our soldiers over in other
6   countries.  If they commit crimes while, let's say, for
7   example, a rape were to occur of a woman while they're on their
8   duty, that goes to a military court because it happened -- or
9   let's say, for example, a terrorist attack the United States
10  and soldiers were combatting them and went -- somebody maybe
11  surrendered and they went beyond and went ahead and shot those
12  people even though they tried to surrender.  If that was beyond
13  their duty, then they would still be tried in military court
14  and there would be a specific charge.  It would not be murder
15  as what we normally know it.  It would actually be something
16  that has to do with going beyond your duty.

17       And, Judge, this kind of ties in to with respect to
18  the fact that if there are no comparable charges, if the charge
19  be a charge issued by a military court, well, this kind of then
20  falls into the argument of the double jeopardy, which, as you
21  know, I did file a motion to dismiss and I'm just preserving
22  that at this time.  But we know that Mr. Hurtado was tried and
23  acquitted and convicted of some lesser charges in a military
24  court.

25       And just to lay the background to make sure it's

1    understood is that when this first occurred, military court and

2    the civilian court in Peru actually fought for jurisdiction.

3    They both wanted to try the case.  It went to the Supreme Court

4    in Peru.  And they decided that, no, these actions took place

5    while in a war area, and so, no, the military court should have

6    jurisdiction of this.

7         And so because of that, Mr. Hurtado for many years he

8    was convicted of some lesser charges.  He appealed it.  He was

9    then convicted again and he was sentenced to six years to which

10   he served his sentence.

11        And I just want to clarify because it is a little bit

12   -- and I know that Mr. White did correct this, but in his

13   original complaint and memorandum, it does say that he did not

14   complete his sentence.  That is not true.

15        Before the amnesty came in in 1985, he had already

16   completed his sentence.  He completed the interior

17   incarceration point, and he was now outside doing, I don't know

18   what they call it there, like a parole, he was doing that when

19   the amnesty came.  So he had essentially served his entire

20   sentence and the amnesty did not affect him in any way

21   whatsoever.

22        So now for Peru to somehow be upset about what

23   happened and now they want to change it and fight it just seems

24   very political.  And I'm going to move that into my next

25   argument which is the sense of injustice that this case

1   creates.  And I am going to stem this argument based on -- and

2   if I can pass these cases forward to the Court.

3           THE COURT:  Sure.

4           MS. PUGLISI:  The first case, Judge, is Galina vs.

5   Fraser, F-r-a-s-e-r, 278 F.2d 77.  It's a 1960 2nd Circuit

6   case.  Now, it's in dicta actually that this case makes its

7   decision.  But what it says is that even though this was not --

8   the facts in this case were not one that the case fell this

9   way.  They said that we can imagine, and I'm looking to the

10  last page, page 3, which is cited, I guess it's 79 in the case.

11          We can imagine situations where the realtor upon

12  extradition would be subject to procedures or punishment so

13  anti-pathetic to a Federal Court's sense of decency as to

14  require re-examination of the principle set out above.

15          In United States vs. Fernandez vs. Morris, this is a

16  Southern District case, it's 99 F.Supp 2nd 1358.  It was one in

17  which Judge Garber actually denied extradition.  Now, he denied

18  it on the basis of the fact that he didn't believe the

19  Government had satisfied the probable cause requirement.

20          But he does give discussion regarding the holding from

21  Galina, and if you look to page 16 in this case, Section D, he

22  talks about how the complete lack of due process accorded to

23  these defendants shocks the conscience and is anti-pathetic to

24  the Court's sense of decency.

25          And he goes on to speak about how there may be times

1  where the Federal Court just should not extradite someone.  And

2  I think that this is one of those times.  This is a case of

3  first impression, though I do not have case law to set out for

4  the Court.  It's a very rare circumstance, I think, where we

5  find ourselves where somebody has actually been tried in the

6  requesting state, and they are coming back and asking for this

7  individual again.

8         And as you know from my motion to dismiss, the treaty

9  did not specifically address that issue.  And I know that was

10  the basis of the Court's finding with respect to why it was not

11  double jeopardy or a violation of non bis in idem.  But we know

12  that Mr. Hurtado was tried and sentenced in this case.  For

13  whatever reason they are asking for him, and I don't believe

14  that the United States should be used as a conduit for Peru to

15  exact their brand of justice.  They think it's okay to ask a

16  man because of the crimes, because of the political climate,

17  and I think we can see that the political climate in Peru has

18  been unstable for the last several decades, if not longer.

19         But we know that ex-President Fugimora [phonetic] was

20  extradited back for crimes.  We know that their current

21  president, Alan Garcia, was not president for a while and now

22  back as president.  So, whatever is going on there, they are

23  trying to use our country to do something very unfair.  Because

24  we don't do that here, we don't try somebody that's already

25  been convicted of a crime.

1          And they may be unhappy about the way the military

2     court did it, but that was their decision.  Their court decided

3     that jurisdiction should be with the military court.  And it's

4     now unfair that Mr. Hurtado has spent many years of his life

5     since 1985 dealing with this issue and he should not be brought

6     back to this country to have to deal with this again.

7          THE COURT:  But isn't the case law clear that we're

8     not to supposed to impose our safeguards on the foreign

9     countries?

10         MS. PUGLISI:  Well, one of the things, and I have a

11    case that I can cite to you.  It's United States -- I'm sorry

12    -- it's In the Matter of Extradition of John Edward Berks,

13    which is 737 F.2d 1477.  It's a 7th Circuit case.  And it has

14    to do with habeas corpus review.  So we're not quite there

15    yet, but I think that it could be applicable in that it says

16    Federal Courts undertaking habeas corpus review of extradition

17    have the authority to consider not only procedural defects in

18    extradition procedures that are of constitutional dimension,

19    but also the substantive conduct of the United States in

20    undertaking its position to extradite if its conduct violates

21    constitutional rights.

22         So I think that if in habeas corpus review of an

23    extradition we can bring up a constitutional violation, we

24    should be able to bring it up here at this point in the

25    proceeding.

1          Judge, obviously, there's a Fifth Amendment

2    constitutional right to be free from double jeopardy.  Every

3    country in the world believes in this principle in some way or

4    another.  And they call it non bis in idem, we call it double

5    jeopardy here.  But every country believes in this principle.

6          So it's not we just that we shouldn't look to that

7    because that's what our country believes in.  We know that

8    other countries do, too.  And I think that Peru is just using

9    this as an excuse.

10          So while other courts, and there are many other

11    courts, Judge, that have cited to this Galina dicta.  They all

12    have found that those particular circumstances do not rise to

13    that and they don't need to address it.  I think that because

14    this is a case of first impression, it's one we've never heard

15    of.  I think this is one of those circumstances.

16          The Court has finally heard a case where a Federal

17    Court should be outraged by what is going on and we should not

18    allow it to occur.

19          THE COURT:  Okay.  Does the Government have any

20    response?

21          MR. WHITE:  Yes, Your Honor.

22          Your Honor, I'm not going to belabor the double

23    jeopardy argument because we have filed a supplement to our

24    complaint showing that all the prior proceedings in Peru have

25    been set aside.  And the Court has ruled as the law of this

1   case that double jeopardy does not apply and that the rule of

2   non-inquiry should not be violated.  Unless the Court has any

3   questions on that aspect.

4          THE COURT:  I have a question on the no probable

5   cause.  And I didn't write down the page number, but,

6   essentially --

7          MR. WHITE:  You have my notes, Your Honor.

8          THE COURT:  You can help me where you were talking

9   about the criminal -- basically, it just cites, I think,

10  Florenco, Floriano.

11         MS. PUGLISI:  Page 102 in Volume 1.

12         MR. WHITE:  Well, Your Honor, in the war of

13  extradition the Court may rely on hearsay.  And that is the

14  hearsay that he committed these crimes, and I think the cite

15  that I gave you shows an investigating commission came back to

16  the area where these seven people were murdered to cover up the

17  prior murders.  I think there's a discussion there, and I think

18  they're named, the seven victims.

19         THE COURT:  Okay.

20         MR. WHITE:  Your Honor, just to put things in

21  perspective, let's go back and review just very quickly what

22  happened here.  This was a military patrol set out that

23  massacred a two-year-old child, pregnant women, they were

24  raped, they were burned, they were subjected to hand grenades

25  and shots.  As I said, this is a two-year-old child is a

1  terrorist?  Yes, there should be some shock on the part of the

2  Court, but it shouldn't be a shock that Peru is extraditing the

3  wrong person.  I'm shocked at the conduct of an officer who

4  violated the oath of any officer in any country.

5         Ms. Puglisi makes a very good point.  She says, well,

6  the Fifth Amendment is recognized by all countries.  Yes, it's

7  recognized by Peru.  And that's a matter that his defense

8  attorney can raise in Peru if there's any validity to it.

9         The other thing that I think is incorrect is her

10  statement that we cannot prosecute American servicemen, or

11  civilian courts can't prosecute them.  Oh, yes, they can.  We

12  have status of forces agreements around the world.  But -- not

13  frequently, but sometimes we do turn over American military

14  servicemen, especially in rape cases, to local authorities for

15  prosecution.  We did it in Okinawa recently.  We have done it

16  in Japan.  We'll do it again.  But that's neither here nor

17  there.

18         THE COURT:  That's outside of their duties.  Here we

19  have a person who was acting as an officer when he committed

20  the act that is being described.  The Okinawa thing don't --

21         MR. WHITE:  That's the Nuremberg defense, Your Honor,

22  and that's something --

23         THE COURT:  Let me finish, please.

24         MR. WHITE:  Yes.

25         THE COURT:  I believe the Okinawa rape was of a local

1   Okinawan woman.  It didn't have anything to do with the soldier

2   being in battle or pursuing orders that had been given to him

3   by his superior.

4          MR. WHITE:  Right.  And as you see in the record, he

5   was asked:  Did you know that the general command did not allow

6   things like this?  And he said:  No, I never heard that.

7          So this was not an order given by his superiors.  If

8   you look at the record, the Supreme Court finds, he says I

9   never knew what the policy was as a lieutenant.  But there was

10  a policy against this.  Obviously, there's a policy.  This was

11  a massacre.

12         Your Honor, looking at the dual criminality, if you

13  would look carefully at the Florida statutes which we can rely

14  on, the term kidnapping under 787.01(1)(a) means forcibly or by

15  threat confining or abducting a person against their will.

16  There's your abduction.

17         But, Your Honor, and then if you would look at murder,

18  in the murder statute, it's certainly, and I've said that it

19  could have been second, first or second degree murder.  But,

20  again, where someone undertakes to commit a felony which would

21  be some sort of a kidnapping which is named in Section 111 of

22  Title 18, Section A says murder is the unlawful killing of a

23  human being with malice and aforethought.  Every murder

24  perpetrated by a deliberate, malicious or a premeditated

25  killing or in attempt to kidnap.  The word kidnapping is again

1    used here.  So that's the felony murder rule.

2             So you take it as the Court wishes.  It's either a

3    kidnapping or murder or both as far as the dual criminality,

4    and this is recognized in Peru and in America.  I don't know

5    about other countries.

6             Your Honor, if you don't have any other questions, I

7    have no other comments.

8             THE COURT:  No, I don't have any other questions.

9             Anything else, Ms. Puglisi?

10            MS. PUGLISI:  No, Your Honor.

11            THE COURT:  I appreciate your time.

12            MS. PUGLISI:  I put exhibits on what I referred to.

13   Do you want me to introduce those so it would be easier to find

14   them?

15            THE COURT:  Yes, that would be great.  Read them into

16   the record so that we have them.

17            MS. PUGLISI:  Defendant's Exhibit A is pages 100 to

18   102 from GX 3.

19            THE COURT:  Right.

20            MS. PUGLISI:  And then Exhibit, Defendant's Exhibit B

21   is pages 569 and 570 from GX 4.

22            THE COURT:  Okay.

23            THE COURT:  And if you could hand them up to me, that

24   would be helpful.  I will staple them together.

25            Anything else?

```
 1            MS. PUGLISI:  No, Judge.

 2            MR. WHITE:  No.

 3            THE COURT:  Thanks for your time and help.  I will get

 4    something out.  If I decide that I need any further briefing, I

 5    will issue and order or my clerk will contact the two of you

 6    and let you know.  Okay?

 7            MS. PUGLISI:  Thank you.

 8            THE COURT:  Thanks a lot.  You all have a good day.

 9                  [Court adjourned at 3:30 p.m.]

10                  C E R T I F I C A T E

11            I hereby certify that the foregoing is an accurate

12    transcription of proceedings in the above-entitled matter.

13

                      s/Larry Herr

14    _____    _____

          DATE            LARRY HERR, RPR-CM-RMR-FCRSC

15                        Official United States Court Reporter

                          400 N. Miami Avenue

16                        Miami, FL  33128 - 305/523-5290

                                        (Fax) 305/523-5639

17                              email:  Lindsay165@aol.com

18

19

20

21

22

23

24

25
```

**A**

abducting 25:15
abduction 8:8,10,18
    8:20 11:8,11 13:5
    16:7 25:16
able 14:6 21:24
about 8:15,25 13:14
    14:14 18:22 19:22
    19:25 21:1 23:9
    26:5
above 19:14
above-entitled 27:12
Accomarca 16:22
accompanied 3:6
accorded 19:22
accurate 27:11
accurately 11:6
accused 13:15
acknowledge 11:6
acquitted 17:23
act 24:20
acting 24:19
actions 10:1,19 11:4
    13:17 18:4
acts 8:15
actual 14:15
actually 7:10 10:12
    11:19 14:2 16:20
    17:15 18:2 19:6,17
    20:5
additional 10:20
    13:3
address 12:23 20:9
    22:13
adjourned 27:9
admit 5:23
admits 11:4
admitted 10:15 14:3
affect 18:20
aforementioned
    15:13
aforethought 25:23
afternoon 3:5,11
again 8:13 9:3,9 10:1
    10:1 11:2 15:20
    18:9 20:7 21:6
    24:16 25:20,25
against 16:18 25:10
    25:15
Agent 3:6
agreements 24:12
ahead 16:10 17:11
aid 3:13
Alan 20:21
alleged 12:24 13:15
    13:17
allow 6:6 22:18 25:5
already 5:25 6:6
    14:19 18:15 20:24
although 11:5
Amendment 22:1
    24:6
America 1:4 26:4
American 24:10,13

**B**

amnesty 18:15,19,20
and/or 16:21
another 12:1 22:4
anti-pathetic 19:13
    19:23
anything 25:1 26:9
    26:25
appeal 5:5
appealed 18:8
appearances 1:12
    3:4
appears 7:14
applicable 4:12,17
    6:20 21:15
application 5:17
apply 23:1
appreciate 26:11
area 10:12 13:2
    16:20 18:5 23:16
argument 11:15
    12:23 14:11,15
    16:16 17:20 18:25
    19:1 22:23
arises 8:14
around 24:12
aside 22:25
asked 25:5
asking 20:6,13
aspect 23:3
Assistant 1:13,16
    3:12
attachments 12:3
attack 17:9
attempt 25:25
attempted 15:15
attorney 1:13 24:8
August 10:5,18,21
authorities 24:14
authority 6:14 21:17
authorized 4:6
Avenue 1:20 27:15

**B**

B 13:14 26:20
back 3:16 11:17 13:2
    20:6,20,22 21:6
    23:15,21
background 17:25
based 19:1
basically 23:9
basis 8:20 19:18
    20:10
battle 25:2
before 1:11 5:21
    8:16 18:15
beginning 3:16 7:18
    8:1 9:19,25 10:3
    10:11,12 11:5
behalf 3:12
behavior 13:18
being 24:20 25:2,23
beings 10:3,20
belabor 22:22
believe 12:1 13:25

**C**

14:8 16:15 19:18
    20:13 24:25
believes 22:3,5,7
Berks 2:8 21:12
beyond 16:25 17:11
    17:12,16
birth 5:19,20
bis 20:11 22:4
bit 18:11
bodies 14:4
body 8:18
both 6:21 9:6 13:6
    18:3 26:3
brand 20:15
brief 3:16 9:6
briefing 27:4
briefly 5:6
bring 21:23,24
brought 21:5
burned 23:24

**C**

C 1:13 27:10,10
call 7:16 12:18 18:18
    22:4,4
called 3:17
came 18:15,19 23:15
capture 16:21
carefully 25:13
case 1:3 3:1,3,16 6:3
    6:12 18:3,25 19:4
    19:6,6,8,8,10,16
    19:21 20:2,3,12
    21:7,11,13 22:14
    22:16 23:1
cases 19:2 24:14
cause 4:22 8:22,23
    9:15,16 12:24 13:4
    14:1,10 19:19 23:5
cedula 5:19
certainly 9:9 25:18
Certificate 2:3
certification 3:18,23
Certified 1:19
certify 27:11
Chacon 15:15
challenged 6:12
chambers 6:3
change 18:23
charge 4:22 8:25
    9:10 13:5 14:14,15
    14:18 16:1,25 17:2
    17:14,18,19
charged 14:18
charges 4:25 16:5,14
    17:18,23 18:8
child 23:23,25
Circuit 3:19,21 19:5
    21:13
circumstance 20:4
circumstances 22:12
    22:15
CITATIONS 2:4
cite 3:21 21:11 23:14

**D**

cited 19:10 22:11
cites 23:9
civilian 18:2 24:11
clarify 18:11
clear 5:4 21:7
clerk 6:8 27:5
climate 20:16,17
Code 8:4,7,9,11,12
    8:15
combatting 17:10
coming 20:6
command 25:5
comments 26:7
commission 10:24
    23:15
commit 17:6 25:20
committed 8:24 9:17
    23:14 24:19
communicat 10:16
comparable 16:1
    17:2,18
complaint 5:13
    18:13 22:24
complete 18:14
    19:22
completed 18:16,16
completes 12:19
conclusion 10:2
conduct 4:6 6:14
    21:19,20 24:3
conduit 20:14
confining 25:15
confusing 12:8
conscience 19:23
consider 21:17
constitutional 21:18
    21:21,23 22:2
contact 27:5
CONTENTS 2:1
contest 4:19,24
contesting 4:3
continuing 8:18
convenience 6:4
convicted 17:23 18:8
    18:9 20:25
copy 5:18 7:13
corpus 5:5 21:14,16
    21:22
correct 7:6 15:7
    16:11,12 18:12
correctly 5:24
corresponding 12:4
counsel 3:24 12:20
counsel's 11:14
count 16:11
countries 17:6 21:9
    22:8 24:6 26:5
country 20:23 21:6
    22:3,5,7 24:4
counts 16:7
court 1:1,19 2:6 3:1
    3:8,10,14,20,22
    4:5,9,9,12,16,20
    5:1,8,11,12,22,23

5:25 6:5,9,15,25
    7:5,9,13,16,19,24
    8:2,25 9:4,12,20
    9:24 10:2,6,10,14
    11:2,10,12,15,17
    11:25 12:2,10,13
    12:15,21 13:5,8,10
    13:23 14:24 15:2,5
    15:9 16:3,6,10,13
    17:3,3,8,13,19,24
    18:1,2,3,5 19:2,3
    20:1,4 21:2,2,3,7
    22:16,17,19,25
    23:2,4,8,13,19
    24:2,18,23,25 25:8
    26:2,8,11,15,19,22
    26:23 27:3,8,9,15
courts 21:16 22:10
    22:11 24:11 25:16
Court's 10:25 19:13
    19:24 20:10
cover 7:17 23:16
covered 4:17 7:21
creates 19:1
crime 4:16 8:8,18
    9:11,14 14:15
    15:25 20:25
crimes 4:16 7:20 8:5
    17:6 20:16,20
    23:14
criminal 8:4,9,11,15
    10:2 13:18 23:9
criminality 6:24
    7:20 14:12 16:16
    25:12 26:3
Cruz 13:19
culmination 10:23
current 20:20
custody 6:6

**D**

D 1:16 19:21
date 5:19 12:25
    27:14
day 27:8
De 13:18
deal 21:6
dealing 8:7 21:5
deaths 10:16
decades 20:18
December 12:3
decency 19:13,24
decide 27:4
decided 18:4 21:2
decision 10:25 19:7
    21:2
declaration 6:21
defects 21:17
defendant 1:8,16
    13:14
defendants 19:23
Defendant's 26:17
    26:20
Defender 1:16 3:12

defense 24:7,21
degree 25:19
deliberate 25:24
denied 19:17,17
described 11:9 24:20
description 13:25
destroy 16:21
dicta 19:6 22:11
dimension 21:18
diplomatic 11:24
  12:1
direct 15:22
disappearance 9:1,2
  14:14,16 16:2,7
disappearance/ab...
  14:13
discussed 10:1
discussing 15:14
discussion 10:11
  19:20 23:17
dismiss 17:21 20:8
disregarded 15:22
District 1:1,1 6:16
  19:16
Division 1:2 10:2
docket 7:1,5,11,14
documents 5:17,18
  12:11
doing 16:24 18:17
  18:18
done 24:15
double 17:20 20:11
  22:2,4,22 23:1
down 9:7 15:3,10
  23:5
dual 6:24 7:20 14:11
  16:16 25:12 26:3
due 19:22
duplicates 6:7
during 15:11 16:24
duties 24:18
duty 16:25,25 17:2,4
  17:8,13,16

E
E 27:10,10
each 4:1,22 8:24
  9:17 14:5,6
early 6:3
easier 26:13
Edward 2:8 21:12
effect 4:13 6:21 8:4
either 9:12 26:2
element 4:3
elements 3:19 4:1
  5:6 16:22
email 27:17
end 13:18 15:11
entire 18:19
equivalent 8:5,11
  9:3,4,5,11,13
especially 24:14
ESQ 1:13,16
essentially 18:19

23:6
established 6:19
even 5:6 17:12 19:7
event 5:4
every 22:2,5 25:23
everybody 16:10
everyone's 8:14
evidence 4:21 8:23
  9:16 13:21 14:9
exact 9:13 14:3
  20:15
example 15:11 17:7
  17:9
except 5:14
excuse 22:9
exhibit 6:23,25 7:1,4
  7:8,10 10:4,22
  11:5,9,15 12:16
  26:17,20,20
exhibits 5:10,11,13
  5:14,17,23,24 6:5
  6:8 12:17 26:12
exhumed 14:4
existing 16:22
extradite 20:1 21:20
extradited 6:18
  20:20
extraditing 24:2
extradition 1:10 2:8
  3:2,15,22 4:6,22
  5:13,21 6:14 9:18
  19:12,17 21:12,16
  21:18,23 23:13
ex-President 20:19

F
F 27:10
fact 14:17 16:16
  17:18 19:18
facts 9:8 13:1 15:21
  15:23 17:1 19:8
falls 17:20
far 6:24 7:20 26:3
Fax 27:16
federal 1:16 3:12 8:6
  17:3 19:13 20:1
  21:16 22:16
Federally 1:19
fell 9:9 19:8
felony 25:20 26:1
Fernandez 2:6,10
  3:19 19:15
few 4:25
fifth 4:20 22:1 24:6
fight 18:23
file 5:25 17:21
filed 3:16 5:11 22:23
files 11:19,20
filing 7:7
final 4:20
finally 8:22 9:15
  10:25 11:8 22:16
find 7:1 13:20 14:1
  20:5 26:13

finding 4:21 8:23
  9:16 20:10
finds 25:8
finish 24:23
first 3:4 4:5 5:9 6:11
  7:22 12:23 18:1
  19:4 20:3 22:14
  25:19
five 3:18
FL 1:14,17,20 27:16
Flagler 1:17
flee 15:15
Florenco 23:10
Floriano 13:18 23:10
Florida 1:1,4 6:17
  8:6,12 25:13
folks 11:3
force 4:13 6:20
forced 8:9,20,25 9:2
  11:8,11 14:12,14
  14:16 16:1,7
forces 24:12
forcibly 25:14
foregoing 27:11
foreign 9:13 21:8
formal 9:18
forth 10:24
forward 19:2
fought 18:2
found 6:15,22 8:19
  10:3,21,22 22:12
fourth 4:16
Fraser 2:7 19:5
free 22:2
frequently 24:13
from 5:1,5 8:21
  11:10 15:17 19:20
  20:8 22:2 26:18,21
front 7:4
Fugimora 20:19
fugitive 4:10
full 4:12 6:20
further 6:11 27:4
F-r-a-s-e-r 2:7 19:5
F.Supp 19:16
F.2d 2:7 19:5 21:13
F.3d 2:9 3:21

G
Galina 2:7 19:4,21
  22:11
Garber 19:17
Garcia 20:21
gave 23:15
general 25:5
give 11:2 19:20
given 5:18 15:12
  25:2,7
go 4:1 5:6 6:13 9:7
  11:17 14:3 16:10
  16:20 23:21
goes 15:6 17:8 19:25
going 7:11 12:6,7
  13:12 14:22 15:10

17:16 18:24 19:1
  20:22 21:17,22
gone 6:18
good 3:5,11 24:5
  27:8
gorilla 16:19
Government 1:13
  3:4,16,25 5:1 6:6
  8:17 13:21 14:9,16
  16:15 19:19 22:19
Government's 4:3
  12:15,18
great 26:15
grenades 23:24
GS 16:23
guess 19:10
guide 8:18 9:8,9 11:8
  11:10 14:12,13
  15:14 16:8
gully 9:9 15:19,24
GX 7:3,5,6,13,16,24
  9:22 11:18,19,19
  11:19,20,22,23,23
  11:23,24,25 12:3
  13:10,11 15:2,5,5
  15:7,8 26:18,21
GX-10 12:16
GX-3 7:25 9:21
  14:22

H
habeas 5:5 21:14,16
  21:22
hand 6:8 7:3 10:6
  23:24 26:23
happened 15:24
  17:8 18:23 23:22
hear 5:1 12:21
heard 22:14,16 25:6
hearing 1:10 3:15
  5:10 7:8
hearsay 23:13,14
Heather 6:22 12:3
help 23:8 27:3
helpful 26:24
her 24:9
Herr 1:18 27:13,14
him 14:18,19 15:24
  18:20 20:13 25:2
holding 19:20
Honor 3:5,9 4:4 5:3
  5:9 6:1,10 7:4,6,12
  7:15 9:2,15,23
  10:9 11:22 12:9,12
  12:19 22:21,22
  23:7,12,20 24:21
  25:12,17 26:6,10
HONORABLE 1:11
housekeeping 11:18
human 10:3,20
  25:23
Hurtado 1:7 3:10,12
  4:10 5:20 8:23 9:8
  10:15 11:4 12:21

13:2 14:2 15:13,17
  16:17 17:22 18:7
  20:12 21:4
Hurtado's 3:24 5:16
  10:1,19 14:7
Hurtado-Hurtado
  3:2 13:15

I
ICE 3:9
idem 20:11 22:4
identify 14:6
identity 5:14 6:19
  12:11
imagine 19:9,11
important 14:21
importantly 6:16
impose 21:8
impression 20:3
  22:14
incarceration 18:17
include 5:13
incorporated 10:25
incorrect 24:9
individual 15:21
  20:7
individuals 13:16
  14:9,20
injured 15:19
injustice 18:25
inquire 3:24
instead 7:9
insufficient 14:9
interior 18:16
interpreter 3:13
interrupt 10:6 16:6
introduce 5:10 26:13
introduced 7:23
investigating 23:15
investigation 10:17
  10:23 15:11
issue 3:22 4:19,24
  5:15 20:9 21:5
  27:5
issued 17:19

J
J 1:11
Japan 24:16
jeopardy 17:20
  20:11 22:2,5,23
  23:1
John 1:11 2:8 21:12
Judge 1:11 4:8 11:16
  12:23 13:7,11,20
  14:8,22 16:4,15,24
  17:17 19:4,17 22:1
  22:11 27:1
judicial 4:5 5:12
jumped 15:19,24
jurisdiction 4:10
  6:17 18:2,6 21:3
just 5:4 6:3,10,13,18
  11:14,17 13:24

14:8 16:6 17:21,25
18:11,23 20:1 22:6
22:8 23:9,20,21
justice 10:2 20:15

**K**

K 6:22
kidnap 25:25
kidnapping 8:12,13
9:3,7,12 25:14,21
25:25 26:3
killing 25:22,25
killings 10:21
kind 13:12 17:17,19
knew 25:9
know 4:2 7:2 8:14,19
8:20 14:19 15:23
15:24 16:24 17:15
17:21,22 18:12,17
20:8,9,11,19,20
22:7 25:5 26:4
27:6
knows 9:12

**L**

La 13:18
lack 19:22
lacking 13:4
LARRY 1:18 27:14
last 15:16 19:10
20:18
later 10:17
law 3:17 6:12 20:3
21:7 22:25
laws 8:5,11
lay 3:18 17:25
leave 11:15
less 12:8
lesser 17:23 18:8
let 4:1 5:1 16:6 24:23
27:6
letter 12:2
let's 11:17 12:21
17:6,9 23:21
Levy 2:9 3:21
lieutenant 25:9
life 21:4
like 5:2,6,9 18:18
25:6
Lima 10:16
Lindsay165@aol.c...
27:17
line 17:2,4
list 10:12
listed 10:16
listing 10:4
little 11:17 18:11
local 6:16,17 24:14
24:25
longer 20:18
look 9:6 13:13 14:1
14:21 15:10,16
19:21 22:6 25:8,13
25:17

looking 19:9 25:12
lot 27:8

**M**

Magistrate 1:11
6:16,17
maintain 6:6
maintained 15:12
make 6:9 12:13
17:25
makes 19:6 24:5
malice 25:23
malicious 25:24
man 20:16
many 18:7 21:4
22:10
mark 11:14
marked 12:15
massacre 25:11
massacred 23:23
match 5:20
matter 2:8 3:2 21:12
24:7 27:12
may 1:5 12:22 19:25
21:1 23:13
maybe 17:10
McShain 6:22 12:3
means 25:14
memorandum 3:17
18:13
mentioned 15:13
met 14:10
Miami 1:2,4,14,17
1:20,20 27:15,16
might 13:3 14:25
military 10:16,24
16:17,21 17:3,8,13
17:19,23 18:1,5
21:1,3 23:22 24:13
mind 8:14
more 6:15 14:6
Morris 2:10 19:15
Most 9:21
motion 17:21 20:8
move 18:24
murder 8:3,6,7,19
9:4,7,10,12 10:3
12:24 13:5,7,8
14:17,19 16:10
17:1,4,14 25:17,18
25:19,22,23 26:1,3
murdered 10:5
15:23 23:16
murdering 10:20
murders 23:17
M-c-S-h-a-i-n 6:22

**N**

N 27:15
name 13:22
named 23:18 25:21
names 10:4,12,17
14:5
need 22:13 27:4

neither 24:16
never 8:19 9:9 15:19
22:14 25:6,9
new 7:10 12:17
next 14:11 18:24
non 20:11 22:4
non-inquiry 23:2
normally 17:15
North 1:20
Northeast 1:14
note 11:24 12:1
noted 7:25
notes 23:7
notice 5:12
number 5:19 7:7
11:2,6 14:3 23:5
numbers 11:18,18
11:20 12:8
Nuremberg 24:21

**O**

oath 24:4
objection 11:16
objective 11:16
observed 13:18
obviously 6:12 22:1
25:10
occur 17:7 22:18
occurred 8:16 18:1
offense 8:24 9:17
offer 5:16
officer 4:5 15:22
24:3,4,19
official 1:19 6:7
27:15
Oh 24:11
okay 3:8,10 5:8 6:5
7:16 9:24 10:10
11:17 12:21 13:23
16:3,13 20:15
22:19 23:19 26:22
27:6
Okinawa 24:15,20
24:25
Okinawan 25:1
old 11:18
one 4:5,9,16,20,20
14:7 19:8,16 20:2
21:10 22:14,15
only 4:24 16:7 21:17
operations 16:21
order 3:22 15:22
25:7 27:5
ordered 16:19
orders 25:2
organization 16:19
16:19
original 7:7 12:5,8
18:13
originals 6:1 7:11
other 5:14 11:20,24
13:16 14:1,4,19,21
17:3,5 22:8,10,10
24:9 26:5,6,7,8

others 13:2
ourselves 20:5
out 3:18 19:14 20:3
23:22 27:4
outraged 22:17
outside 18:17 24:18
over 4:10 5:6 6:13
6:17,18 17:5 24:13
own 5:12
O'SULLIVAN 1:11

**P**

page 2:2,5 6:22,25
8:1 9:6,19,20,21
9:25 10:4,8,10,21
10:22 11:2,5,9,12
11:13 13:12,13
15:6 16:23 19:10
19:10,21 25:1,25
pages 12:4,5 13:12
14:22 15:8 26:17
26:21
paragraph 15:10,16
parole 18:18
part 4:24 6:9 9:19,25
24:1
particular 4:3 22:12
parties 6:4
pass 19:2
passport 5:16
Path 16:18
patrol 10:18 23:22
people 14:6 17:12
23:16
permission 11:14
perpetrated 25:24
perpetration 13:15
person 5:21 6:18
14:5 15:14 24:3,19
25:15
perspective 23:21
Peru 8:16,21 9:12
10:16 14:18 18:2,4
18:22 20:14,17
22:8,24 24:2,7,8
26:4
Peruvian 8:4,9,10,15
petition 5:5
Philomeno 15:15
phonetic 20:19
picture 5:20
place 5:19 13:17
18:4
Plaintiff 1:5
please 10:7 24:23
point 6:11 18:17
21:24 24:5
policy 25:9,10,10
political 18:24 20:16
20:17
portion 13:4 15:16
portions 14:4
position 8:16,17
21:20

Poxa 2:9 3:21
pregnant 23:23
premeditated 25:24
present 3:13 13:3
presented 13:21
preserving 17:21
president 20:21,21
20:22
principle 19:14 22:3
22:5
prior 22:24 23:17
probable 4:22 8:22
8:23 9:15,16 10:20
12:24 13:4 14:1,10
19:19 23:4
probably 15:5
procedural 21:17
procedures 19:12
21:18
proceed 5:2
proceeding 4:7 6:14
21:25
proceedings 4:14
6:11 22:24 27:12
process 19:22
proof 4:3
prosecute 24:10,11
prosecution 24:15
prosecutor 9:10
prove 3:25
Puglisi 3:11,11 4:2,4
4:8,11,15,19,24
5:18 6:2 9:22
11:16 12:23 13:7,9
13:11,24 14:25
15:3,8,10 16:4,9
16:12,14 19:4
21:10 23:11 24:5
26:9,10,12,17,20
27:1,7
punishable 8:8
punishment 19:12
purposes 5:10 7:8
pursuant 8:8
pursuing 25:2
put 7:7 23:20 26:12
p.m 27:9

**Q**

question 8:14 16:17
23:4
questions 12:20,22
23:3 26:6,8
quickly 23:21
quite 21:14

**R**

R 27:10
raise 24:8
rape 17:7 24:14,25
raped 23:24
rare 20:4
rather 12:6
read 11:20 26:15

**realm** 8:6
**Realtime** 1:19
**realtor** 19:11
**reason** 20:13
**recently** 24:15
**recognized** 24:6,7
 26:4
**record** 5:4 6:7,9
 10:15 14:4 25:4,8
 26:16
**records** 5:12
**refer** 7:10 12:6 13:9
 13:11 14:22
**reference** 6:10
**referred** 4:13 26:12
**referring** 7:22 9:22
 10:7 15:2,7,12
 16:23
**refused** 15:18
**regarding** 10:3
 19:20
**relate** 5:14
**relevant** 9:19,25
**rely** 7:11 23:13
 25:13
**relying** 11:21
**REPORTED** 1:18
**Reporter** 1:19,19
 27:15
**Reporter's** 2:3
**request** 3:18 8:21
 9:18
**requested** 4:17 7:21
**requesting** 20:6
**require** 3:25 19:14
**required** 3:22
**requirement** 19:19
**respect** 12:24,25
 14:8,11,12 16:4,14
 17:17 20:10
**response** 22:20
**revealed** 10:17
**review** 21:14,16,22
 23:21
**reviewed** 6:3
**re-examination**
 19:14
**ribbons** 6:2
**Ricardo** 1:7 3:2
 13:14
**rid** 13:2
**right** 5:21 7:4,18 8:2
 12:2,10 13:11 22:2
 25:4 26:19
**rights** 21:21
**rise** 22:12
**Room** 1:20
**RPR-CM-RMR-F...**
 27:14
**RPR-RMR-FCRR...**
 1:18
**rule** 6:16,17 23:1
 26:1
**ruled** 22:25

**S**
**Sabrina** 1:16 3:11
**safeguards** 21:8
**same** 5:11 7:7
**satisfied** 19:19
**satisfy** 16:15
**says** 9:6 12:21 13:17
 15:11 19:7 21:15
 24:5 25:8,22
**seals** 6:2
**seated** 3:14
**second** 4:9 6:22,25
 25:19,19
**section** 6:15 8:3,7,8
 8:10,13 13:13,14
 19:21 25:21,22
**see** 13:24 17:5 20:17
 25:4
**seems** 9:8 18:23
**seen** 9:9 15:19
**sense** 18:25 19:13,24
**sentence** 18:10,14,16
 18:20
**sentenced** 18:9
 20:12
**separate** 11:10
**September** 3:17
 10:19 13:1
**served** 18:10,19
**servicemen** 24:10,14
**set** 19:14 20:3 22:25
 23:22
**seven** 10:22 11:3
 12:10,24 13:16
 14:8 23:16,18
**several** 20:18
**Shining** 16:18
**shock** 24:1,2
**shocked** 24:3
**shocks** 19:23
**shot** 9:8 15:13,17,22
 17:11
**shots** 23:25
**show** 5:19 7:24
**showing** 22:24
**shown** 6:21 7:22
**shows** 10:15 23:15
**signed** 12:2
**simple** 16:16
**since** 8:15,17 21:5
**situations** 19:11
**six** 10:20 18:9
**soldier** 25:1
**soldiers** 17:5,10
**some** 12:22 17:23
 18:8 22:3 24:1
 25:21
**somebody** 17:10
 20:5,24
**somehow** 18:22
**someone** 20:1 25:20
**something** 17:15
 20:23 24:22 27:4
**sometimes** 24:13

**sorry** 3:19 10:22
 11:2 15:3 21:11
**sort** 6:2 25:21
**sought** 4:23 6:18
**Southern** 1:1 6:16
 19:16
**Spanish** 3:13
**speak** 19:25
**speaks** 13:17
**Special** 3:6
**specific** 13:22 17:14
**specifically** 12:25
 13:12,13 14:5,12
 14:13 15:14,17
 20:9
**spent** 21:4
**spoke** 14:16
**stands** 9:11
**staple** 26:24
**starts** 13:13
**state** 20:6
**stated** 11:6
**statement** 11:5
 13:20 15:12,17
 24:10
**statements** 14:2
**States** 1:1,4,11,19
 2:6,10 3:6,17,20
 8:5,7,11,12,17
 14:16 15:25 17:3,9
 19:15 20:14 21:11
 21:19 27:15
**status** 24:12
**statute** 8:6,12 25:18
**statutes** 25:13
**stem** 19:1
**sticker** 7:8
**stickers** 7:10 12:7
**still** 17:13
**stipulate** 3:25 4:2,7
 4:11,15
**stipulated** 5:7,15
**stop** 15:18
**Street** 1:14,17
**subject** 19:12
**subjected** 23:24
**substantive** 21:19
**sufficient** 4:21 8:22
 9:16 13:25 15:25
**summary** 11:15
 12:13,15,18,19
 13:24
**superior** 25:3
**superiors** 16:20 25:7
**supplement** 22:23
**support** 3:17 4:21
 8:23 9:8,16
**supposed** 21:8
**Supreme** 2:6 3:20
 10:2,25 18:3 25:8
**sure** 15:18 17:25
 19:3
**surrender** 4:17 7:21
 17:12

**surrendered** 17:11
**surrounding** 13:1
**s/Larry** 27:13

**T**
**T** 27:10,10
**TABLE** 2:1
**take** 5:12 26:2
**talking** 14:14 23:8
**talks** 13:14 19:22
**Telmo** 1:7 3:2 13:14
**term** 25:14
**terrorist** 16:19,22
 17:9 24:1
**Thank** 3:14 5:3 7:12
 27:7
**Thanks** 27:3,8
**their** 3:18 7:10 17:7
 17:13 20:15,20
 21:2,2 24:18 25:15
**thing** 6:2 14:21 24:9
 24:20
**things** 9:21 21:10
 23:20 25:6
**think** 11:24 13:3
 14:21 15:21,25
 20:2,4,15,17 21:15
 21:22 22:8,13,15
 23:9,14,17,17 24:9
**third** 8:25
**though** 5:6 17:12
 19:7 20:3
**threat** 25:15
**through** 4:1 5:24 6:5
 12:4
**throughout** 4:14
 9:18
**Ticse** 15:15
**ties** 17:17
**time** 5:16 8:5,20
 10:18 16:17,24
 17:5,22 26:11 27:3
**times** 19:25 20:2
**Title** 25:22
**today** 3:1,15 5:2
 11:21
**together** 26:24
**told** 16:20
**top** 9:6
**TRANSCRIPT** 1:10
**transcription** 27:12
**translation** 12:4
**treaty** 4:12,13,18
 6:20,20 7:21 20:8
**tribunals** 10:24
**tried** 17:12,13,22
 20:5,12
**true** 18:14
**try** 18:3 20:24
**trying** 20:23
**turn** 24:13
**two** 5:14,14 12:11
 27:5
**two-year-old** 23:23

 23:25
**T-i-c-s-e** 15:15

**U**
**unable** 13:20 16:15
**under** 7:10 25:14
**underlying** 17:1
**understand** 5:24
 16:6
**understood** 18:1
**undertakes** 25:20
**undertaking** 21:16
 21:20
**unfair** 20:23 21:4
**unhappy** 21:1
**United** 1:1,4,11,19
 2:6,10 3:6,17,20
 8:5,7,11,12,17
 14:16 15:25 17:3,9
 19:15 20:14 21:11
 21:19 27:15
**unlawful** 25:22
**Unless** 23:2
**unstable** 20:18
**upset** 18:22
**USC** 6:15,21
**use** 12:7 20:23
**used** 12:11 20:14
 26:1
**using** 3:13 7:9 22:8
**U.S** 1:13 2:6 3:20

**V**
**validity** 24:8
**various** 10:24
**very** 18:24 20:4,23
 23:21 24:5
**victims** 11:7 12:25
**Victor** 3:6,8
**villagers** 10:4,13
**violated** 23:2 24:4
**violates** 21:20
**violation** 8:3,10
 20:11 21:23
**visa** 5:17
**volume** 7:7,22,25
 9:22 10:7 11:22,23
 11:23,23 12:4 13:9
 13:10 14:25 15:4
 23:11
**VORA-PUGLISI**
 1:16
**vs** 1:6 2:7,9,10,10
 3:21 19:4,15,15

**W**
**want** 4:2 6:13 18:11
 18:23 26:13
**wanted** 3:24 14:18
 18:3
**war** 16:18,18 18:5
 23:12
**warrant** 5:21 11:1

way 18:20 19:9 21:1
  22:3
well 3:20 7:9 8:1 9:2
  9:5 12:17 14:7
  17:19 21:10 23:12
  24:5
went 13:2 16:25
  17:10,11,11 18:3
were 5:7 10:20 14:5
  17:7,10 19:8 23:8
  23:16,23,24,24
West 1:17
we'll 5:23 7:16 12:13
  24:16
we're 3:15 7:11 12:6
  12:7 21:7,14
we've 22:14
whatsoever 18:21
while 17:1,4,6,7 18:5
  20:21 22:10
White 1:13 3:5,5,9
  5:3,9 6:1,10 7:3,6
  7:12,15,18,20,25
  8:3 9:2,5,21,25
  10:9,11,15 11:4,11
  11:13,22 12:1,9,12
  12:14,19 18:12
  22:21 23:7,12,20
  24:21,24 25:4 27:2
William 1:13 3:5
Williams 3:7,8
wishes 26:2
witness 13:20,22
  14:2,7
witnesses 10:21 13:3
woman 17:7 25:1
women 23:23
word 25:25
world 22:3 24:12
writ 5:5
write 15:3 23:5
wrong 24:3

**X**

x 1:9

**Y**

years 18:7,9 21:4
yellow 12:7
yield 12:20

**Z**

zone 16:18

**0**

0 12:5
08-MC-22414 3:3
08-MC-22414-UN...
  1:3

**1**

1 5:24 6:5 8:1 9:22
  11:24 12:4,4 13:9
  13:10 14:25 23:11

10 12:13,16,17
100 13:12 26:17
101 13:13
102 13:12 23:11
  26:18
111 25:21
1111 8:7
115 15:10
12 9:19,20,21,25
1201 8:13
13 10:19
13th 13:1
1358 19:16
14 10:5,18
14th 10:21
1477 21:13
150 1:17
152 8:3
16 19:21
18 6:21 8:6,12 25:22
183 12:5
19 2:7,10
1924 8:4,9
1960 19:5
1985 10:5,18,19 13:1
  18:15 21:5
1993 8:11,15

**2**

2 7:3,5,6,13,16 11:20
  11:22,25
2nd 19:5,16
20 12:17
2007 12:3
2009 1:5
21 2:8
22 11:9,13
223 8:9
238 10:4,8,9
239 10:10
25 10:16
268 2:6 3:20
27 2:3
278 2:7 19:5

**3**

3 2:6,9 6:17 9:22
  11:19,19,23 12:4
  13:10,11 15:5
  19:10 26:18
3rd 3:19,21
3:30 27:9
305.523.5290 1:20
305.530.7000 1:17
305.961.9451 1:14
305/523-5290 27:16
305/523-5639 27:16
312 2:6 3:20
3181 6:21
3184 6:15
320 8:10
324 11:5
33128 1:20 27:16
33130 1:17

33132 1:14
37 8:1

**4**

4 11:23,23 15:2,5,7,8
  16:23 26:21
4th 1:14
40 10:17
400 1:20 27:15
465 2:9 3:21
470 15:6
480-something 15:6
483 12:4

**5**

5 1:5 11:23,23
554 2:9 3:21
556 16:23
569 14:22,24 15:8
  26:21
570 14:23 15:8 26:21

**6**

6 11:23
62 10:4,12,17 14:1
69 10:3

**7**

7 5:24 6:5,23,25 7:1
  11:23 12:3
7th 21:13
737 21:13
77 2:7 19:5
782.04 8:6
787.01 8:12
787.01(1)(a) 25:14
79 19:10

**8**

8 5:17,23 6:8,15
  12:11,17
8N09 1:20
81 10:22 11:4

**9**

9 5:18,23 6:8 12:11
  12:17
99 1:14 19:16

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)  **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
TELMO HURTADO HURTADO

## DEFENDANTS
ERIC HOLDER, UNITED STATES ATTORNEY GENERAL, AND HILARY CLINTON, UNITED STATES SECRETARY OF STATE

**(b)** County of Residence of First Listed Plaintiff  Miami-Dade (FDC)
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Federal Defender's Office
Sabrina Puglisi
150 West Flagler Street, Suite 1700
Miami, Florida 33130
(305) 530-7000 Ext 222

Attorneys (If Known)

**(d)** Check County Where Action Arose: ✓ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
✓ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

Dade 09cv 21504 - Cooke/Bandstra

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ✗ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS  Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ✓ YES ☐ NO
JUDGE Magistrate O'Sullivan     DOCKET NUMBER 08-22414  08-22414-MC-O'Sullivan

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 2241-habeas corpus relief from Order Certifying Extradition and Order of Commitment

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
Sabrina Puglisi

DATE  6/3/09

FOR OFFICE USE ONLY
AMOUNT _____  RECEIPT # _____  IFP _____